UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3.27.19

------------------------------------------------------------X

IN THE MATTER OF THE COMPLAINT
OF BOUCHARD TRANSPORTATION
CO., INC., MOTOR TUG ELLENS.
BOUCHARD INC. and B. NO. 280
CORPORATION, AS OWNERS, OWNERS
*PRO HAC VICE*, AND OPERATORS OF
THE: BARGE B. NO. 280 and TUG ELLEN
S. BOUCHARD

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

POWER AUTHORITY OF THE STATE OF
NEW YORK,

     *Plaintiffs,*

  -*against*-

The Tug M/V ELLEN S. BOUCHARD, and
the Barge B. NO. 280, their engines, apparel,
tackle, boats, appurtenances, etc., *in rem*, and
BOUCHARD TRANSPORTATION CO.,
INC., MOTOR TUG ELLEN S.
BOUCHARD, INC. and B. NO. 280 CORP,
*in personam,*

     *Defendants.*

------------------------------------------------------------X

14 Civ. 1262 (PAC)

**OPINION & ORDER**

14 Civ. 0617 (PAC)

HONORABLE PAUL A. CROTTY, United States District Judge:

  Limitation Plaintiffs Bouchard Transportation Co., Motor Tug Ellen S. Bouchard (the

"Tug"), Barge B. No. 280 (the "Barge") and B. No. 280 Corporation (collectively, "Bouchard")

filed an action to limit their liability for a maritime event which occurred on January 6, 2014.

Bouchard dropped anchor in Hempstead Harbor, allegedly damaging an underwater electrical

cable. Limitation Defendants Power Authority of the State of New York ("NYPA"), the Long

Island Lighting Company ("LIPA"), Associated Electric & Gas Insurance Services Limited,

Energy Insurance Mutual Limited, Brit UW Limited, Talbot Underwriting (US) Limited, Princeton

Excess & Surplus Lines Insurance Company, Westport Insurance Corporation, Aspen Specialty Insurance Company, Navigators Management Company, Inc., New York on behalf of Lloyd's Syndicates: 1221 Navigators, 4000 Pembroke and 2015 Channel and National Union Fire Insurance Company of Pittsburgh, PA (collectively, "Cable Interests") move for partial summary judgment denying Bouchard's entitlement to exoneration or limitation of liability under the Limitation of Liability Act, 46 U.S.C. § 30501 *et seq.* Bouchard also moves for partial summary judgment finding NYPA comparatively negligent under the spoliation doctrine and for summary judgment dismissing all claims asserted by LIPA.

For the reasons set forth below, NYPA's motion for partial summary judgment denying Bouchard's entitlement to exoneration or limitation is DENIED. Bouchard's motion for partial summary judgment finding NYPA comparatively negligent for spoliation is DENIED, and Bouchard's motion for summary judgment dismissing claims asserted by LIPA is GRANTED.

## BACKGROUND

The Y-49 Cable System is an electrical transmission system that runs from Sprain Brook in Westchester, New York to East Garden City in Long Island, including a submarine portion comprised of four cables that run beneath the Long Island Sound. Foley Ex. 1, Bouchard Responses to Requests to Admit ("RFA") # 20, 22.[1] NYPA owns the Y-49 Cable System, which was installed in 1991 pursuant to a permit issued by the Army Corps of Engineers (the "ACOE permit"). The ACOE permit mandates that any cables placed in soft-sediment areas of the seabed be buried

---

[1] In this Order, the exhibits submitted in support of Cable Interests' motion for partial summary judgment denying Bouchard's entitlement to exoneration or limitation (14-cv-1262, Dkt. #158; 14-cv-617, Dkt. #101) are labeled "Foley Ex.," and Bouchard's opposition exhibits are labeled "Meehan Ex." The exhibits associated with Bouchard's motion to dismiss claims asserted by LIPA (14-cv-01262, Dkt. #152) are labeled "Venezia Ex.," and LIPA's opposition exhibits are labeled "Hohenstein Ex." The exhibits relating to Bouchard's motion for summary judgment finding NYPA comparatively negligent (14-cv-1262, Dkt #155; 14-cv-4462, Dkt. #89; 14-cv-617, Dkt. #98) are labeled "Walsh Ex.," and Cable Interests' opposition exhibits are labeled "Vincent Foley Ex." Consistent with the agreed-upon Confidentiality Order, 14-cv-1262 Dkt. 67, and the parties discussion at the June 21, 2018 status conference, the parties' briefs and exhibits have not been docketed.

"approximately 10 feet" beneath the sea floor. Venezia Ex. 1; Foley Ex. 6. After the Y-49 Cable System was installed, NYPA received as-built drawings and reports which, according to NYPA, confirmed the burial depths of the submarine cables at various locations along the seabed. Pirelli Cable Corporation Report ("Pirelli Report"), Foley Ex. 7.

Bouchard, a corporation headquartered in Melville, New York, is the operator of the Tug and Barge. Foley Ex. 1, RFA #1-2. At the time of the incident giving rise to this litigation, Bouchard's east coast fleet was based out of Melville and its homeport was the Port of New York. Foley Ex. 1, RFA, # 5-6. Bouchard's business included the transportation of oil cargoes from New York and Boston, and its vessels sometimes transited through Hell's Gate, a waterway in the East River that connects the Long Island Sound to New York Harbor. Foley Ex. 1, RFA #8. Bouchard was aware of the navigational challenges the Hell's Gate waterway posed, including a narrow waterway, heavy traffic, and strong currents. Foley Ex. 36, Hudgins Tr. at 64; Meehan Ex. 26, Brady Tr. at 83-85; Complaint for Exoneration from or Limitation of Liability, 14-cv-1262, Dkt. 2, ¶ 10.

The Incident

On January 6, 2014, the Tug and the Barge were moving westbound through the Long Island Sound enroute to New Jersey with the intention of transiting the East River. Foley Ex. 1, RFA #77; Foley Ex. 13, Yates Tr. at 149. Daniel Yates, the Captain of the Tug, took navigational control around 5:30 a.m. and, because there was a heavy fog restricting visibility, decided to anchor in an area labeled as a "Cable Area" in the Hempstead Harbor to wait until the fog lifted. Foley, Ex. 1, RFA #79; Foley Ex. 13, Yates Tr. at 148-49. At Yates' direction, around 6:58 a.m. the Barge's approximately 6,030-pound cast steel anchor was dropped and remained anchored until around 11:00 a.m., when Yates determined it was safe to proceed. Foley Ex. 1, RFAs ## 36, 95,

96, 260-62, 268; Yates Tr. at 183-90, 203-05; Foley Ex. 15, Yates Ex. 19 at B2797. Yates later admitted that when he anchored that morning, he misread the dotted lines on the navigational charts as indicating where the cables were, instead of the space where cables were located. Yates Tr. at 241.

That same morning, at around 7:02 a.m., the Y-49 Cable system experienced an electrical fault in submerged Cable No. 3 (the "Cable"). Foley Ex. 19, Zuccarelli Tr. at 131-34, 36-37, 40-41, 51-56, 65-66. NYPA's engineers quickly discovered there had been a failure in the Cable, likely arising from a rupture, and that the dielectric fluid used to insulate the Cable was now leaking into the Long Island Sound. Zuccarelli Tr. at 50-53; Foley Ex. 2, Schwabe Tr. at 98. Cable Interests allege that the system failure was caused by the Barge dropping anchor into the Cable Area and striking the Cable.

Yates resigned from his position three days later. Meehan Ex. 39 at B176. He was subsequently investigated and charged by the U.S. Coast Guard for violating 33 C.F.R. 110.155(1)(2), which prohibits anchoring outside a designated anchorage area. Meehan, Ex. 41; Yates Tr. at 234.

The Clean Up & Collection of Discoverable Evidence

Shortly after the Cable failure was discovered, NYPA joined with the United States Coast Guard and the New York State Department of Environmental Conservation to establish a Unified Command to coordinate an emergency environmental response and halt the leaking of dielectric fluid into the water. Schwabe Tr. at 85-86; Vincent Foley Ex. 9. At the direction of the Unified Command, NYPA hired surveyors and commercial divers to locate the Cable's fault point. Vincent Foley Ex. 12, Kahabka Tr. at 74. On January 25, 2014, NYPA's divers located the fault/rupture point in the Cable, and by January 28, 2014, the divers had successfully clamped the Cable at the

impact point to partially halt the leaking. Vincent Foley Ex. 3 at NYPAY49-0007812. Throughout their expeditions, the divers documented their efforts in a series of dive video recordings, as instructed by NYPA. Vincent Foley Ex. 14, Coogan Exs. 18-22. They also took measurements using a pneumofathometer, an instrument used to calculate the depth of a diver "by measuring the pressure in a hose filled with air."[2] In one of these videos, dated January 28, 2014, a diver Keith Michalski can be seen and heard reading a pneumofathometer reading, which he orally pronounces to be 40 feet.[3] Vincent Foley Ex. 14, Coogan Ex. 22 at 33:45.

As part of the recovery effort, the Cable was to be capped and the ruptured section lifted and removed from the seabed. Schwabe Dec., Vincent Foley Ex. 8, at 4. Given the pending litigation, and concerned about preserving evidence, Bouchard requested permission from NYPA to send its own diving team to inspect the Cable before it was removed. Walsh Ex. E. Unable to reach resolution on their own, and with the plan to remove the Cable looming, Bouchard wrote to the Court seeking emergency intervention. *See* 14-cv-617, Dkt. #6. At a hearing held on February 14, 2014, NYPA represented to the Court that Bouchard's divers could potentially delay or harm the emergency response effort underway, and that their efforts would be duplicative; NYPA had already taken surveys, "photographs, videos, [and] site scan sonar," all of which would be turned over to Bouchard in discovery. Heeding NYPA's concerns about halting or interfering with the response effort, the Court denied Bouchard's request to inspect. Walsh Ex. H. at 26. Nonetheless,

---

[2] "Pneumofathometer," *Glossary of Underwater Diving Terminology*, Wikiwand http://www.wikiwand.com/en/Glossary_of_underwater_diving_terminology#/P (last accessed Dec. 20, 2018); *see also* Bouchard Reply Memorandum in Support of Motion for Partial Summary Judgment, 14-cv-1262, Dkt. #176 at 3, n.5; Vincent Foley Ex. 26 at ¶ 6.

[3] Bouchard disputes the reliability of Michalski's declaration authenticating the disputed pneumofathometer measurement, because during his deposition, Michalski stated he had no recollection of taking a measurement on that day. Michalski Tr. at 109. Bouchard's objection goes to the weight of the evidence and Michalski's credibility, both of which are irrelevant for purposes of summary judgment where "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also* Fed. R. Evid. 901.

the Court noted that if "the information is[] not satisfactory . . . or overlooked something that should have been taken, [NYPA] may very well be proceeding at its peril and there may be sanctions." *Id.*

The Cable was ultimately replaced, and the Y-49 Cable System fully repaired by May 2014. NYPA claims damages of $22,168,509.69 for the cost of repairs. Foley Ex. 29.

Bouchard's Reporting Structure, Safety Protocols & Hiring of Yates

At the time of the incident, Bouchard's Melville office housed the company's Chief Executive Officer Morton S. Bouchard III ("CEO Bouchard"), as well as its dispatchers, who were on duty twenty-four hours a day to assign cargoes to barges and act as liaisons between the customers, vessels, and management. Meehan, Ex. 24, Bouchard Tr. at 83-85; Foley Ex. 1, RFA #133. Through various technologies, Bouchard's dispatchers could monitor the general location of Bouchard's vessels and communicate with crewmembers if needed. Foley Ex. 1, RFA #147; Brady Tr. at 50. A crewmember aboard each of Bouchard's vessels was also required to send dispatchers a nightly report, known as the Daily Report, which was incorporated into a morning day sheet prepared for CEO Bouchard and often was reviewed by members of Bouchard's Management. Bouchard Tr. at 86-90; 146-47. The morning day sheet included information on the vessels' general location, loading, discharging, underway times, and anchoring. Foley, Ex. 1, RFAs ## 142-43. In the years 2012 and 2013, Bouchard's Daily Reports document eight instances where Bouchard's vessels anchored in the Hempstead Harbor. Foley, Ex. 37 ¶ 5.

Bouchard left the decision of where and when to anchor to each vessel's Captain and Mate. Bouchard Tr. at 105-06. By January 2014, the company had also implemented a Safety Management System ("SMS") which applied to all of its vessels, including the Tug and Barge. Meehan Ex. 38 at B1052. The SMS had a general provision, Section 10.1, that directed its mariners

to "comply fully with all applicable local, state, national and international laws," *id.*, and a section, Section 10.14, to specifically address anchoring. *Id.* at B1075. Section 10.14.3(a) makes specific reference to 33 C.F.R. part 110.11(d)(16)(ii), a regulation that governs the Port of New York, and Section 10.14.3(b), which states "Operating Procedures to Comply with Federal Regulations" *Id.* at B1075. On the date of the Incident, the Tug also had NOAA chart number 12366 onboard. Yates Tr. at 151-52. The then-current NOAA chart number 12366 contained specific warnings regarding submarines pipelines and cables and referred mariners to both 33 C.F.R. 110.155 and the U.S. Coast Pilot 2 Manual, which contains guidance specific to the Atlantic Coast region. Meehan Ex. B34.

Bouchard hired Daniel Yates in December of 2011 and promoted him to Captain of the Tug in April of 2013. Meehan Ex. 39. On the date of the incident, Yates held all of the necessary credentials and licenses to stand watch on the Tug. Meehan Ex. 27, DiNapoli Tr. at 71; Meehan Ex. 32 at 4, ¶ 2. Yates had anchored a Bouchard vessel in the Hempstead Harbor prior to January 6, 2014, although he was unable to recall how many times, or any specific instance. Foley Ex. 1, RFA ## 131-32; Yates Tr. at 242-43.

Claims Asserted by LIPA

The energy generated by the Y-49 Cable System is used principally by LIPA pursuant to a Facilities and Marketing Agreement (the "F&M") with NYPA.[4] Venezia Ex. 1 ("F&M") at § 7.1; *see also* Venezia Ex. 4, Camp. Tr. at 36. LIPA pays NYPA a monthly fee in exchange for its use of the Y-49 Cable System, and to cover "the cost to [NYPA] for construction of and/or modifications to the [Y-49 Cable System] facilities and for the financing of such facilities." F&M

---

[4] The F&M was initially entered into by the Long Island Lighting Company ("LILCO"). Venezia, Ex.1. LIPA acquired LILCO in approximately 1998 and assumed LILCO's rights and responsibilities under the F&M Agreement. Fishman Tr. at 8-9. For simplicity, "LIPA" is used in this Order to refer to both LILCO when acting as predecessor in interest to LIPA, and LIPA.

at § 7.1. Under the F&M, NYPA retains the right to use some of Y-49 Cable System's capacity for its own customers and reduce LIPA's fee proportionately. F&M at §7.1. At least since 2010, however, NYPA's own usage of the energy generated by the Y-49 Cable System has never exceeded ten percent. Camp. Tr. at 36. The Y-49 Cable System was principally designed, constructed and installed by NYPA, although the F&M required LIPA to review and offer feedback on NYPA's "plans, drawings, and specifications." F&M at § 1.1.

NYPA and LIPA also have an Operations and Maintenance Agreement (the "O&M"), which provides that, "if a fault occurs in the [submerged] cables, [LIPA] will lend assistance to NYPA to identify the failed cable prior to repair," but that "repairs to the failed [submerged cable] will be the responsibility of NYPA." Venezia Ex. 2 at 16. The F&M also contains a provision on costs which provides that LIPA "shall become obligated to make monthly payments . . . as determined by NYPA in its sole discretion to . . . cover the cost of operation and maintenance expenses incurred by NYPA as determined by it." F&M § 7.2.

No routine maintenance work is required on the submerged cable portion of the Y-49 Cable System, Venezia Ex. 6, Voos Tr. at 100, and NYPA handled all repairs and costs arising from the January 6, 2014 Cable incident. Camp. Tr. at 85-86; Venezia Ex. 11. No property owned by LIPA was damaged by the Cable incident, Voos Tr. at 63, and NYPA has yet to pass on any of the repair and clean-up costs it incurred from the Incident to LIPA. Camp. Tr. at 85-86.

LIPA joins this litigation claiming damages of $2,367,000 for alleged costs incurred supplying power to customers in the fourteen days the Y-49 Cable System was not operational. Venezia Ex. B12, LIPA's Fifth Amended Initial Disclosures. LIPA also claims $350,048 in damages relating to congestion rent shortfalls.[5] *Id.*

_____

[5] The market for transmission of electricity within New York is governed by a series of rules issued and administered by the New York Independent System Operator, Inc ("NYISO"). Hohenstein Decl., Ex. 15. LIPA alleges that it lost

# ANALYSIS

## I.  Legal Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, (2007) (citing Fed. R. Civ, P. 56(c)). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

Thus, Rule 56 "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." *Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 94 (2d Cir. 2003) (citation and alteration omitted). "Even where facts are disputed, the nonmoving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor." *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001), *superseded in part and on other grounds by* Fed. R. Civ. P. 37(e).

---

of certain revenues and incurred certain additional costs associated with NYISO rules on congestion rent shortfalls and real time congestion residuals. *Id.*

## II. Cable Interests' Motion for Partial Summary Judgment

### A. The Limitation of Liability Act

Cable Interests move for partial summary judgment denying Bouchard's claims for exoneration or limitation of liability pursuant to 46 U.S.C. § 30505 *et seq.* The Limitation of Liability Act limits the "liability of the owner of a vessel for any claim, debt, or liability . . . [to] not exceed the value of the vessel and pending freight" provided such liabilities "arise[e] from . . . any act, matter, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of the owner." 46 U.S.C. § 30505. Upon receiving written notice of a claim, the vessel owner has six months to bring a civil action in federal district court stating the facts upon which the right to limitation is asserted and providing security for the vessel. Fed. R. Civ. P. Suppl. Rule F ("Rule F"). Usually, once a vessel owner satisfies the filing requirements for a limitation proceeding, "all claims and proceedings against the owner or the owner's property with respect to the matter in question shall cease." *Id.* Notice is then issued to all persons asserting claims against the owner, and those parties can then file claims in the limitation proceeding challenging the vessel owner's right to limitation. *Id.*

Once all claims have been filed, the court, sitting in admiralty without a jury, conducts a *concursus* proceeding to determine whether limitation is warranted and if so, how the funds are to be disbursed. *Complaint of Dammers & Vanderheide & Scheepvaart Maats Christina B.V.*, 836 F.2d 750, 755 (2d Cir. 1988). Assessing whether limitation is appropriate requires two steps. *Otal Investments Ltd. v. M/V CLARY*, 673 F.3d 108, 115 (2d Cir. 2012). First, the court determines what acts of negligence or unseaworthiness caused the incident. *Id.* If there is no negligence or actionable conduct, there is no liability to limit, and the vessel owner is entitled to complete

exoneration. *In re Bridge Const. Servs. of Fla., Inc.*, 39 F. Supp. 3d 373, 382 (S.D.N.Y. 2014). Where negligence or unseaworthiness is shown, however, the court moves on to the second step and asks whether the vessel owner "had knowledge or privity of those same acts of negligence," precluding the vessel owner's entitlement to limitation. *Otal Investments Ltd. v. M/V CLARY*, 673 F.3d 108, 115 (2d Cir. 2012) (internal citation omitted). "The claimants bear the initial burden of establishing liability, after which the vessel owner bears the burden of establishing the lack of privity or knowledge." *In re Bridge Const. Servs. of Fla., Inc.*, 39 F. Supp. 3d at 382.

In this action, Bouchard "concedes that Yates was negligent in anchoring in the cable area" and that it is not entitled to exoneration. Bouchard's Opp, 14-cv-1262, Dkt. 168 at 1. Thus, for purposes of this motion, the only question is whether Bouchard is entitled to limit its liability.

### B. Bouchard's Privity or Knowledge

Bouchard contends that it could not have anticipated Yates' negligent act and that accordingly, the negligent conduct here was not within its privity or knowledge. "The phrase 'privity or knowledge' is a 'term of art meaning complicity in the fault that caused the accident.'" *In re Complaint of Messina*, 574 F.3d 119, 126 (2d Cir. 2009). Privity or knowledge can be either actual or constructive, and its inquiry is fact-specific. *Otal Investments Ltd. v. M/V CLARY*, 673 F.3d 108, 115 (2d Cir. 2012). Still, the term "usually implies some degree of culpable participation or neglected duty on the shipowner's part; that, for example, it committed a negligent act[,] or through the exercise of reasonable diligence could have prevented the commission of the act." *Id.* (quoting *Carr v. PMS Fishing Corp.*, 191 F.3d 1, 4 (1st Cir.1999)).

Disputes of material fact preclude the Court from determining on summary judgment whether Yates' conduct was within Bouchard's privity or knowledge. The Court agrees with Bouchard that the privity or knowledge inquiry is confined to the negligent act that caused the

incident, see *In re Bridge*, 39 F. Supp. at 382, but here, the negligent act remains in dispute. Bouchard would have the Court define Yates' negligent act narrowly as his decision to anchor in a cable area and his misreading of the lines marking the location of the cables. Indeed, Yates was charged by NOAA in this case for anchoring in a cable area, implying that it was this conduct alone that was negligent. *See* Meehan Ex. 41. Cable Interests, however, define Yates' negligent act as anchoring in the Hempstead Harbor at all, a practice Bouchard's vessels did on more than one occasion, and which Cable Interests believe is a *per se* violation of federal regulation 33 C.F.R. pt. 110.155.

Although disputes over statutory or regulatory interpretation are typically ripe for resolution on summary judgment, applying the relevant regulation to the facts here leaves ambiguities the Court cannot resolve on the current record. 33 C.F.R. pt. 110.155, states, in relevant part: "[e]xcept in cases of great emergency, no vessel shall be anchored in the navigable waters of the Port of New York." The parties agree that this regulation applied to the Tug and Barge, and that the Hempstead Harbor falls within the Port of New York. Foley Ex. 1, RFA #106.

Complicating the Court's analysis, however, are two reports from the U.S. Coast Pilot, one published for the 2013 year and the other for the 2014, which *recommend* the Hempstead Harbor as a place to anchor and seek shelter. Meehan Ex. 35. Although both guides note that "special anchorage" applies in the Hempstead Harbor and direct readers to the relevant regulations, including 33 C.F.R. 110.1, *id.*, in doing so, these guides clearly contemplate that following the regulation, and anchoring in the Hempstead Harbor, are not mutually exclusive. The reliability of these reports and their authority within the industry is supported by their authors: the U.S. Department of Commerce, NOAA, and the National Ocean Service, agencies all of whom undoubtedly played a role in the development of the relevant regulations in the first instance. *See*

33 U.S.C. § 1231 (directing the Secretary of the department of the Coast Guard to, in developing regulations, consult with "interested federal departments and agencies.").

Resolving this dispute is critical to determining privity or knowledge in this case. If anchoring in the Hempstead Harbor alone was negligent, Cable Interests' evidence that Bouchard's vessels anchored there on prior occasions, navigated by Yates or otherwise, would go directly to Bouchard's knowledge of the conduct. Such a finding would be particularly harmful for Bouchard here, as vessel owners are typically held to a higher standard of diligence and knowledge of applicable laws in their homeport. *See, e.g., The Linseed King*, 285 U.S. 502, 510-12 (1932). On the other hand, if anchoring in a cable area was the negligent act, this case turns on a much narrower question of whether Bouchard did enough in hiring, training, and monitoring the conduct of Yates to ensure his continued compliance.

Cable Interests' other arguments in support of their motion also necessitate a clear definition of the negligent act. For example, the Court cannot assess whether Bouchard's policies and procedures were inadequate as they relate to Hempstead Harbor, without knowing what conduct was actually prohibited in that area of Long Island Sound. Nor can the Court determine whether Bouchard's senior staff was on notice that such conduct was occurring without knowing the conduct for which it is to look.

In sum, there are material issues in dispute that preclude the Court from granting Cable Interests' motion. Cable Interests motion for partial summary judgment denying Bouchard from Limitation is DENIED.

### III.    Bouchard's Motion for Partial Summary Judgment under the Spoliation Doctrine

Bouchard also moves for partial summary judgment arising from Cable Interests' purported failure to measure the depth at which the Cable was embedded in the subsea floor prior to its

removal on February 19, 2014. According to Bouchard, NYPA's failure to take this measurement constitutes spoliation, violates this Court's order of February 14, 2014, and is sanctionable pursuant to Rule 37(b)(2) of the Federal Rules of Civil Procedure. As a remedy, Bouchard asks the Court to conclusively find the Cable depth in violation of NYPA's U.S. Army Corps of Engineers permit and hold NYPA comparatively negligent as a matter of law pursuant to *The Pennsylvania* Rule. *See The Pennsylvania,* 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1873).

## A. Legal Standard

"If a party . . . fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a)," Rule 37(b)(2) empowers a court to take any action that is just, including "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims." *Id.* On a motion for sanctions, courts consider factors including: "(1) the willfulness of the non-compliant party or the reason for the noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance, and (4) whether the non-compliant party had been warned of the consequences of his non-compliance." *Kyoei Fire & Marine Ins. Co. v. M/V Mar. Antalya*, 248 F.R.D. 126, 143 (S.D.N.Y. 2007) (quoting *Nieves v. City of New York*, 208 F.R.D. 531, 535 (S.D.N.Y.2002)).

"Spoliation is 'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *Orbit One Commc'ns, Inc. v. Numerex Corp.,* 271 F.R.D. 429, 435 (S.D.N.Y. 2010) (quoting *Byrnie v. Town of Cromwell, Board of Education*, 243 F.3d 93, 107 (2d Cir.2001)). Where sanctions are sought for spoliation, the party moving for sanctions bears the burden to show: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the

destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (quoting *Byrnie*, 243 F.3d at 107-12).

Where sanctionable conduct is found, courts have broad discretion in fashioning a remedy, including "the discretion to delay the start of a trial (at the expense of the party that breached its obligation), to declare a mistrial if trial has already commenced, or to proceed with a trial and give an adverse inference instruction." *Residential Funding*, 306 F.3d at 107.

### B. Analysis

Cable Interests contend that spoliation sanctions are not appropriate because the relevant depth measurement was properly taken and turned over in discovery in at least three ways. First, they point to the Pirelli Report, which they contend provides the as-built measurement of the Cable depth shortly after it was installed in 1991. Foley Ex. 7. Second, they rely on the video taken on January 28, 2014 depicting a diver taking a pneumofathometer reading at the fault location, Coogan Ex. 22, and third, they point to a measurement taken of the fiber optic cable before the final repair of the Cable in May 2014. Foley Ex. 23 - Schwabe Ex. 12 NYPAY49-0057261. According to NYPA, the fiber optic cable has been attached to the Cable since its installation in 1991 and remained in the same location, under tension, during the repairs, making it a reliable indicator of the ruptured Cable's depth at that same point.

The record clearly establishes that what Bouchard requested, and what the Court ordered be produced, was a measurement of the Cable's depth after the Incident, but before the ruptured portion of the Cable was lifted from the seabed. Focusing, then, on the January 28, 2014 measurement, the diving video depicts diver Keith Michalski taking a pneumofathometer reading of 40 feet, allegedly at 3:23 p.m. at the rupture point. Vincent Foley Ex. 14, Coogan Ex. 22 at

33:45. Cable Interests contends that an accurate measure of the Cable's depth can be obtained from Michalski's reading simply by taking the measurement and subtracting from it NOAA's predicted tide level for the date and time, which here results in a measurement of approximately ten feet. Cable Interests further maintain that pneumofathometer readings are accurate depth assessments. As evidence, they point to a report from W.J. Castle PE & Associates ("Castle"), experts commissioned by Bouchard, in which Castle describes the pneumofathometer measurement as accurate and reliable,[6] and Michalski's declaration, in which he describes the pneumofathometer reading as "standard industry practice for recording depth measurements." Foley Ex. 26 at ¶10.

Bouchard disagrees that the pneumofathometer reading provided by NYPA is accurate. In its view, Cable Interests cannot rely on the NOAA predicted tide levels because they are, in fact, *predicted*, and even NOAA cautions against relying on them for accuracy. *See* Preamble to Tide Tables 2014, Walsh Ex. N. Bouchard finds further proof of unreliability in the various pneumofathometer readings in NYPA's divers' reports, stating "the readings tend to be all over the place and in one instance, showed a 50-foot reading which, if NYPA's version is to be believed, would mean a 20-foot trench, something no one is claiming." Bouchard Rep., 14-cv-1262, Dkt # 177 at 8. According to Bouchard, the only way a pneumofathometer measurement can be accurate is if it is compared to an actual measurement of the depth of the water to the natural sea bottom, taken at the same time as the pneumofathometer reading. The divers for NYPA did take this kind of measurement on January 16, 2014, but that was before the divers located the Cable's failure

---

[6] In the methodology section, Castle describes its final, diving phase, stating, "[t]he diver was also able to provide very accurate water depth readings. A pneumofathometer system attached to a diver was used... .This method of water depths is more accurate than fathometric survey using sonar and is accurate to within .10 of a foot. This is due to the sonar possibly penetrating soft silt layers before recording depth data." Castle Report, Vincent Foley Ex. 21 at 5.

point and is not the measurement Bouchard seeks.

Without ruling on the accuracy of NYPA's ten-foot Cable depth measurement, the Court finds NYPA's discovery production did not violate a court order, as required for sanctions under Rule 37(b)(2), and does not constitute spoliation. As Bouchard conceded on the record during oral argument, the Court's ruling on February 14, 2014 denied Bouchard's request to conduct its own inspection of the Cable and ordered Cable Interests to turn over all the measurements it told the Court it had already taken. 2/12/19 Oral Argument Tr. at 49, 59. Cable Interests did just that. There is no proof that any evidence was destroyed, altered, or withheld. Instead, Bouchard disputes the reliability of the methodology utilized by Cable Interests to take this measurement. Yet, as was also made clear at oral argument, Bouchard never specified to Cable Interests how it wanted this measurement taken. *Id.* at 57-58.

The record reflects that Cable Interests was thorough and forthcoming with Bouchard throughout the discovery process. NYPA specifically instructed its divers to take videos and precise logs of documenting their daily activity during the recovery efforts, all of which was timely turned over to Bouchard. Bouchard cannot now, looking at a voluminous record of measurements in its possession thanks to Cable Interests, pick out some it believes were not precise enough and declare spoliation or sanctionable conduct. It is neither.[7]

For the above stated reasons, Bouchard's motion for summary judgment finding NYPA comparatively negligent is DENIED.

---

[7] Even if sanctions were warranted here, the Court notes that Bouchard's requested relief, finding NYPA comparatively negligent pursuant to *The Pennsylvania Rule*, is not an appropriate remedy. *The Pennsylvania Rule* is a burden shifter; it is "not determinative of the ultimate finding of negligence." *In re Bridge Const. Servs. of Fla., Inc.*, 140 F. Supp. 3d 324, 336 (S.D.N.Y. 2015).

## IV.    Claims Against LIPA

Bouchard also moves to dismiss the claims asserted by LIPA under *Robins Dry Dock &
Repair Co. v. Flint*, 275 U.S. 303 (1927).  In an action arising out of a negligent maritime tort,
Robins Dry Dock and its progeny preclude a party from recovering purely economic losses absent
physical damage to property in which that party either owns or possesses a proprietary interest.
*See Am. Petroleum & Transp., Inc. v. City of New York*, 737 F.3d 185, 195–96 (2d Cir. 2013).

There is no dispute here that NYPA, not LIPA, owns the submarine portion of the Cable
that was damaged in this action and LIPA concedes that the damages it seeks here constitute
"purely economic losses." *See* LIPA Opp. at 10.  LIPA argues, however, that it has a proprietary
interest in the damaged Cable sufficient to survive a *Robins Dry Dock* challenge.  The Second
Circuit has adopted the Fifth Circuit's test for establishing a proprietary interest, which here
requires LIPA to show: (1) actual possession or control; (2) responsibility for repair; and (3)
responsibility for maintenance of the damaged property. *G & G Steel, Inc. v. Sea Wolf Marine
Transp., LLC*, 380 F. App'x 103, 104 (2d Cir. 2010) (citing *IMTT-Gretna v. Robert E. Lee SS*, 993
F.2d 1193, 1194 (5th Cir. 1993)).

Bouchard, however, contends that the Court need not reach the proprietary interest analysis
because LIPA already fully litigated and lost on this issue in the Southern District of Texas, *see In
re Horizon Vessels, Inc.*, No. H-03-3280 (S.D. Tex, Nov. 1, 2006), and is thus collaterally estopped
from rearguing it here.  The Court agrees.  In any event, the Court determines that LIPA has
completely failed to show it has a proprietary interest in the underwater cable system.

### A. Legal Standard

Collateral estoppel prevents the re-litigation of an issue where: "(1) the identical issue was
raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous

proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 91 (2d Cir. 1997); *see also Postlewaite v. McGraw-Hill, Inc.*, 333 F.3d 42, 48 (2d Cir. 2003); *Cty. of Westchester v. U.S. HUD*, 778 F.3d 412, 417 (2d Cir. 2015). An issue may not be identical under the doctrine's first factor, even when premised on the same legal question and underlying facts, where "controlling facts or legal principles have changed significantly since the [prior litigation]." *Fulani v. Bentsen*, 862 F. Supp. 1140, 1148 (S.D.N.Y. 1994). Still, courts have construed this rule narrowly, with some declining to find a changed legal principle even in the presence of a clear circuit split, as such an application could "encourage the parties to forum shop, thereby undermining the purpose of collateral estoppel in promoting the finality of judgments." *Fulani*, 862 F. Supp. at 1151; *see also Yamaha Corp. of Am. v. United States*, 745 F. Supp. 734, 737 (D.D.C. 1990), *aff'd*, 961 F.2d 245 (D.C. Cir. 1992).

## B. Analysis

### i. The Texas Litigation

LIPA has already litigated and lost on the exact same question at issue here—whether it has a proprietary interest in the Y-49 Cable System's damaged submarine cable—in a previous litigation. In *In re Horizon Vessels*, a barge was performing pipeline work in the Long Island Sound and its anchor allegedly damaged the Y-49 Cable. Magistrate Judge Johnson Mem. & Rec., 3-cv-3280 (S.D. Tex.), Dkt. 302; Venezia Ex. B13 at 3. There, as in here, LIPA sought damages in the vessel owner's limitation proceeding for "transmission operation impacts, which consist of financial losses in the electric power market, and replacement electrical capacity, which includes the procurement of additional emergency power via electric generators." *Id.* at 11. A general contractor for the pipeline project, Iroquois Gas, moved for summary judgment dismissing LIPA's

claims under *Robins Dry Dock*, arguing that LIPA did not own or have a proprietary interest in the damaged Y-49 cable. *Id.* at 11-12. Both parties briefed the issue extensively, with LIPA given leave to file both an opposition brief and an additional sur-reply. *Id.*

Ultimately, U.S. Texas Magistrate Judge Johnson recommended granting summary judgment in favor of Iroquois Gas, concluding: "Because LIPA has failed to demonstrate it had actual possession or control, responsibility for repair, and responsibility for maintenance of the submerged portion of the cable, it has not established a proprietary interest in the damaged property." *Id.* After LIPA filed an additional twenty-five-page objection, District Judge Sim Lake nonetheless adopted Magistrate Judge Johnson's recommendation and dismissed LIPA's claim. Order Adopting Mem. & Rec., 3-cv-3280 (S.D. Tex.), Dkt. 317; Venezia Ex. B14. LIPA appealed to the Fifth Circuit, but then reached a settlement with the parties and the appeal was voluntarily dismissed. Hohenstein Decl. ¶ 30.

LIPA does not attempt to dispute that at least the final three collateral estoppel factors are met here. The issue of whether LIPA had a proprietary interest in the Y-49 Cable System was actually decided by the Southern District of Texas, LIPA had more than a full and fair opportunity to litigate it, and resolving the question was central to the Texas court's order dismissing LIPA's claims. LIPA argues, however, that collateral estoppel's first factor is not met because of a supposed difference between controlling law. *See Fulani*, 862 F. Supp. at 1148. According to LIPA, the Second Circuit follows a narrower interpretation of *Robins Dry Dock* than the Fifth Circuit, and this difference precludes the application of collateral estoppel here.

### ii. *Robins Dry Dock* in the Second Circuit

LIPA's position is flawed for two reasons. First, even assuming Second Circuit courts "take a less rigid approach," LIPA Opp. at 17, when applying the Fifth Circuit's three-factor

proprietary interest test, such a difference does not constitute a changed legal principle. As already noted, courts have applied collateral estoppel to bar re-litigation even in instances where the prior litigation was brought in a circuit with different controlling law. *See Fulani*, 862 F. Supp. at 1151. Against this backdrop, LIPA's argument that a difference in the "rigidity" in which two circuits apply the same law constitutes a "changed legal principle" can hardly be taken seriously.

Even were this argument convincing, the Court disagrees with LIPA's reading of controlling law as it relates to *Robins Dry Dock*'s interpretation in this Circuit. As recently as 2014, the Second Circuit considered the *Robins Dry Dock* rule and unequivocally affirmed its continued vitality in the Circuit's admiralty jurisprudence, declaring: "economic losses are not recoverable for an unintentional maritime tort in the absence of physical injury." *American Petroleum & Transp., Inc. v. City of New York*, 737 F.3d 185, 195–96 (2d Cir. 2013). In reaching this holding, the court acknowledged that its own treatment of the rule had followed a "somewhat uneven course," *id.* at 192, and that, in its view, the rule had been interpreted more broadly than originally intended. *Id.* Nonetheless, the court found the principle so well settled across jurisdictions that it declined to disrupt it, noting that parties typically had other means available to recover their losses, namely through first-party insurance, and that at least "the rule has the virtue of certainty." *Id.* at 196.

The facts of *American Petroleum* admittedly did not require application of the proprietary interest test. But the court reviewed its own precedents, some of which did assess a claim to a proprietary interest in damaged property, in reaching its ultimate holding that *Robins Dry Dock* would continue to broadly bar recovery of purely economic losses in the Circuit. LIPA relies on one of these earlier precedents in particular, *Kinsman Transit Co. v. City of Buffalo* ("*Kinsman II*"), 388 F.2d 821 (2d Cir. 1968), to argue that while the Second Circuit has expressly adopted the

Fifth Circuit's three-factor proprietary interest test, courts in the Second Circuit "have not interpreted the factors as stringently or rigidly" and "have never fully abandoned considerations related to foreseeability, proximate cause, or the nature of the plaintiffs damages." LIPA Opp. at 16-17.

The Court disagrees with LIPA's reading of the controlling case law in this Circuit. It is true that in *Kinsman II*, a 1968 case, the Second Circuit declined to apply the *Robins Dry Dock* rule to bar a transportation company's claim for purely economic losses arising from a series of vessel collisions, instead basing its denial on traditional tort principles of foreseeability and remoteness. 388 F.2d at 825. But the Second Circuit revisited this exact case in its 2014 *American Petroleum* decision before declaring: "Having surveyed the field *and our own slightly wavering contribution to it*, we now explicitly accept the broad rule attributed to *Robin Dry Dock*." 737 F.3d at 195-96 (emphasis added). To argue that *Kinsman II*'s tort principles have continued application, notwithstanding *American Petroleum,* is inconsistent with the opinion's express caution concerning its own "slightly wavering" precedents. Since 2006, the Second Circuit has only more closely aligned itself with the interpretation of *Robins Dry Dock* "adopted by a clear consensus of courts," including the Fifth Circuit; clearly, this cannot constitute a changed legal principle.[8]

Because there is no material difference in the controlling law of the Second and Fifth Circuits regarding LIPA's claim, the requirements of collateral estoppel are easily met. LIPA does not own the damaged Cable and is precluded from claiming a proprietary interest in it. As such,

---

[8] LIPA also relies on two district court opinions, decided before *American Petroleum,* in which courts declined to grant summary judgment against plaintiffs claiming a proprietary interest in damaged property. *See In re Moran Enters.,* 77 F. Supp. 2d 334 (E.D.N.Y. 1999) *(cable); MTA Metro-North R.R. v. Buchanan Marine, L.P.,* Civ. No. 3:05-cv-881 (PCD), 2006 U.S. Dist. LEXIS 89617 (D. Conn. Dec. 11, 2006 (bridge). These cases are unpersuasive as they relate to the instance case. Both were decided before the Second Circuit clarified its previously "wavering" treatment of *Robins Dry Dock* and neither actually found a proprietary interest, just facts sufficient to survive summary judgment. Notably, in *Metro-North,* the court stated "Metro-North's claim that it has a proprietary interest is a weak one." 2006 U.S. Dist. LEXIS 89617 at *28.

LIPA's claims for purely economic losses and are barred under *Robins Dry Dock* and its progeny. *See American Petroleum*, 737 F.3d 195-96. Bouchard's motion for summary judgment dismissing claims asserted by LIPA is GRANTED.

## **CONCLUSION**

For the reasons stated above, NYPA's motion for partial summary judgment denying Bouchard entitlement to exoneration or limitation is DENIED. Bouchard's motion for partial summary judgment finding NYPA comparatively negligent for spoliation is DENIED, and Bouchard's motion for summary judgment dismissing claims asserted by LIPA is GRANTED.

The Clerk of the Court is instructed to close the motions at Dkts. 152, 155 and 158 on 14-cv-1262 and Dkts. 98 and 101 on 14-cv-0617.

Dated: New York, New York        SO ORDERED
      March 27, 2019

PAUL A. CROTTY
United States District Judge