# EXHIBIT 1

**Captain R. Russell Johnson**

**RJ Maritime Associates, LLC**

465 Davis Bay Road

Lopez Island, Washington 98261

Date: February 15, 2018

Subject Opinion: Power Authority of the State of New York vs Bouchard Transportation Co.

---

## Expert Report

I have been asked by Mr. Wayne Meehan of the law firm Freehill Hogan & Mahar, LLP to examine the facts and provide my professional opinion as to the circumstances surrounding the Barge No. 280 and the Tug M/V Ellen Bouchard on the morning of January 6th, 2014 when it anchored in the vicinity of Hempstead Harbor, New York.

In preparation for this report I have reviewed the following documents:

1. Daniel Yates deposition with exhibits
2. Gene Anthony Hudgins deposition with exhibits
3. Eric Thomas deposition with exhibits
4. Michael Brady deposition with exhibits
5. Eddie Bender deposition with exhibits
6. Morton S. Bouchard deposition with exhibits
7. Robert Glas deposition with exhibits
8. Kyle LaRose deposition with exhibits
9. Keith Reiners deposition with exhibits
10. Personnel file of Daniel Yates (B174-259)
11. Anchor Winch Instruction Manual (B1-57)
12. Captain's Relieving Report for Barge 280 and Ellen Bouchard (B971-1036)
13. SMS Section 2 (Main Policies and Section 10 (Navigation) (B1037-1082)
14. Bouchard Navigation Advisories (2013) (includes 2014 – Anchoring in CIS (Post Accident) (B1126-1156)
15. Certificate of Documentations & COI (tug and barge) (B90-94)
16. Safety Alerts (B1157-1236)
17. Tug and Barge SIRE Audits (2012-2014) (B1237-1369)
18. Internal Vetting Inspections (Tug and Barge) (2012-2014) (B1370-1449)
19. ABS Class Survey Reports (B95-173)
20. Barge No. 280 Anchor Details (B58-59)
21. Outside Service Reports for Ellen S. Bouchard (B2065-2090)
22. Bi-Weekly Inspection Reports (2012-2014) Ellen S. Bouchard (B2091-2200)



EXHIBIT

Johnson – 1

5-16-18

1

23. Radio Telephone Certificate (B2201-2204)
24. Compass Deviation Card (B2205)
25. Compass Correction Card (B2206)
26. USCG Boarding Report (Ellen S. Bouchard) (B2207-2210)
27. USCG Towing Vessel Examinations ((B2211-2225)
28. Miscellaneous Internal Vetting (B2228-2414)
29. Log Book of the Ellen S. Bouchard (B2415- 2798)
30. 2013-2014 Log Book of Barge No. 280 (B2799-3206)
31. SMM, Section 0, Company Policy Statements (B9981-9982)
32. SMM, Section 5, Vessel Captains (B9983-9988)
33. SMM, Section 6, Vessel Crew (B9989-10013)
34. Hours of Rest of Seafarers (B10018)
35. Crew Training Record (B10019)
36. Tug Daily Standing Orders (B10032)
37. Eric Thomas Statement (B10035-10037)
38. James Doller Addition to Statement (B10038-10039)
39. James Doller Statement (B10040-10044)
40. Keith Reiners Statement (B10045-10047)
41. Log/Daily Report (January 5-7, 2014) (B10048-10053)
42. Bouchard SMM Sections 1, 3, 4, 15, and 18 (B16544)
43. Towing Officer Assessment Record (TOAR) for Near Coastal and Oceans
44. 46CFR 10.412 Service Requirements for master of ocean or near coastal steam or motor
    vessels of not more than 1600 gross tons.
45. MITAGS and PMI Maritime Training Guide for Mate and Master 500 GRT or higher
46. STCW for OICNW at Operational and Management Level – references pending
47. 33CFR 110.155 Port of New York
48. Chart Correction Card
49. James Doller deposition and exhibits

## Personal Background

My Curriculum Vita is attached as Exhibit A to this report. By way of background relevant to the
issues in this case, I currently hold a 1600 ton Master of Oceans license with an endorsement as
Master of Towing Vessels, which I have held continuously for 45 years. During my career I have
been the Captain of towing vessels ranging from 9000 horsepower ocean going tug boats to 500
horsepower harbor tugs. As a captain I have towed or pushed oil barges from 10,000 barrels to
150,000 barrels, ranging in length from 200' to 450'. I have anchored hundreds of times in
harbors worldwide utilizing the anchor gear on the barges.

From 1975 until 1983 I was a Captain for Crowley Maritime Corporation based out of Seattle,
Washington. Much of that time I was engaged in towing oil barges to various ports in Alaska
and along the West Coast. In 1983 I came ashore as Port Captain with fleet and personnel
management responsibilities in Seattle, Washington. From 1984 until 1989 I was the General

2

Manager for Harbor Tug and Barge, San Francisco, a Crowley Maritime business that included oil barge movement in the San Francisco Bay area. In 1989 I was again promoted to Marine Operations Manager for Crowley Maritime, Seattle, with responsibility for all vessel operations for the West Coast of the U.S. and Alaska. In this capacity I was responsible for the safe operations of over 100 tugs and barges many of which operated in service to the oil industry.

From 1994 until 1996 I returned to sea as a Captain for Dunlap Towing Co. based in Everett, Washington. In 1997 I started working for Harley Marine Services out of Seattle, Washington. During that period, I served both as a Captain and in a staff position as West Coast Operations Manager. As a Captain at Harley I towed dozens of oil barges in Puget Sound and the West Coast. As a manager at Harley I was responsible for vetting the qualifications and performance of vessel personnel, day to day operations of the fleet, as well as sharing dispatch duties on the weekends.

In 2000 I was offered a position at Dunlap Towing Company as the Director of Safety, Training, and Regulatory Compliance. At Dunlap I was responsible for implementing the International Safety Management System (ISM) which is the recognized and often required system of the International Maritime Organization. I was also responsible to ensure that the company operated within the guidelines of the Responsible Carrier Program ("RCP") of the American Waterway Operators ("AWO"), the national trade organization of the marine towing industry. Dunlap Towing Co. operated 26 towing vessels some of which were engaged in towing oil barges. On each of these vessels I performed regular safety audits in compliance with ISM and AWO standards. I was certified to perform internal ISM audits in 2006.

I served as a member of the AWO Regional Safety Committee for over 10 years. From 2007 until 2012 I served on the AWO Board of Directors for the Western Region and was Vice Chairman in 2011 and 2012. For the past thirty years I have been responsible for investigating accidents and injuries aboard towing vessels owned by the companies I have worked for. The chief reason for these investigations is to determine the root cause of the incident. Accordingly, I am trained in root cause analysis and have been certified by the American Bureau of Shipping through the Bureau of Shipping Marine Industry RCA/Incident Investigation Course. In 2011 I received U.S. Coast Guard approval as a "Qualified Instructor" for 16 different licensing courses at Pacific Maritime Institute, Seattle, Washington. The courses include Seamanship, Shiphandling, Radar, Bridge Resource Management, Navigation, Rules of the Road, Watchkeeping, and Officer in Charge of a Navigation Watch. In 2013 I was recertified as a "Designated Examiner" for assessment of competence of candidates for towing license and sign off of Towing Officer Assessment Records (TOAR).

## Facts and Observations

3

1. The Ellen S. Bouchard and the Barge B No. 280 are operated by y Bouchard Transportation Co. Inc. and were on charter to Sea River Maritime Corporation and contracted to haul refined oil product between the harbors of Boston and New York. The Tug and Barge are separate units.  After construction, the tug Ellen S Bouchard was retrofitted with an Intercon coupler system. While the tug is still capable of towing barges with a conventional wire arrangement, using the Intercon coupler system, the tug and barge are capable of operating similar to an ATB.  The Tug and barge departed the Gulf Chelsea dock in Boston at 0500 hrs. on January 5th, 2014 bound for New York. According to the Voyage Plan commonly utilized for this trip the distance is 240.917 miles. (exemplar Voyage Plan, 6/29/15, Boston to New York) The trip was uneventful until the morning of January 6th when the Tug and Tow experienced thick fog with 0 (zero) visibility. (Ellen S. Bouchard log, January 6th) The Master, Daniel G. Yates was on watch at the time. Because of the visibility conditions Captain Yates made a decision to suspend the voyage and find a safe anchorage. The decision to anchor by Captain Yates was made on the spur of the moment and he decided to seek refuge in Hempstead Harbor, Long Island Sound. He dispatched deckhand James Doller from the tug and was assisted by barge tankerman, Eric Thomas in dropping the anchor on the barge. According to Ellen's log book the barge anchored at 40 degrees, 52.6 minutes north and 73 degrees, 41.3 degrees west at 0700 hrs. After a few hours the fog lifted and at 1100 hrs. Captain Yates ordered the anchor raised and Doller returned to the barge. With the help of Keith Reiners they raised the anchor and the Tug and Barge continued its voyage.

2. The Ellen S. Bouchard and the Barge B 280 were in all respects equipped and fit for the intended purpose of anchoring and there were no deficiencies in either vessel that led to the decision to anchor in Hempstead Harbor. The mate, Tony Hudgins, completed a Voyage Plan as required before the vessel left Boston and the vessel was in compliance with the voyage plan until they had to deviate due to the fog and anchor for a short time in Hempstead Harbor.

3. According to the position marked on chart #12366 and the latitude and longitude provided in the log book the Ellen S. Bouchard and the Barge  B No 280 anchored in the middle of a cable area at 0700 hrs. on January 6th, 2014. James Scott Doller was the deckhand on The Ellen S. Bouchard and was dispatched from the Tug by Captain Yates to lower the anchor with the help of Eric Thomas, the barge Captain. Doller stated in his interview that the anchoring evolution was uneventful. Eric Thomas operated the windlass. Neither Thomas nor Doller played any part in the decision regarding where and when to anchor. They received all anchoring instructions from Capt. Yates.  At the command of Captain Yates they dropped anchor and let out 4 shots of chain as the tug slowly backed down until the anchor set. Doller was again aboard to assist Keith Reiners

4

when they raised anchor at 1100 hrs. Dollar reports he did not feel the anchor hang up at any time and at no time did he observe a sheen on the water. (Interview with James Scott Doller, B10040-10044)) Thomas reports that at no time while raising the anchor did he feel an excessive strain on the windlass that would indicate that something was caught in the anchor. (Interview with Eric Thomas, B10037) Tankerman, Keith Reiners was on duty for raising the anchor and he also reported in his interview that there were no issues with the anchor and did not feel it hang up. He also stated that if it hangs up on something it will often slow down and sometimes stop the winch motor. This did not occur. Later that day a break in the underwater cable was reported by the State of New York Power Authority in the area where the Ellen S. Bouchard and its barge had anchored. Captain Yates and his crewmembers were totally unaware that they may have damaged an underwater cable at the time. The anchor was raised without incidence or complication and there is nothing to indicate that the Ellen S. Bouchard or the barge B No 280 was deficient in any respect.

4. The U.S. Coast Guard investigated the incident and the alleged damage to the underwater cable and subsequent oil spill into the waters of Hempstead Harbor. The investigation's Factual Allegations of Misconduct concluded that the Ellen S. Bouchard and the Barge B No 280 had indeed anchored in a cable area as indicated on chart #12366. (Yates, exhibit #31)

5. Bouchard Maritime has been an International Safety Management (ISM) certified company for over 15 years. Compliance with the ISM code requires a yearly audit, both internal and external, of the company's Safety Management System (SMS). The external audits are performed by the American Bureau of Shipping (ABS), an independent classification society. Bouchard has submitted to and passed dozens of external audits of their safety management system and its vessels at the time of the alleged damage to the underwater cable. As a responsible maritime company, Bouchard management routinely visits their vessels when in port to speak with the crew, ascertain how the voyage went, if there were any issues or problems, and to see if they had any questions. At the same time, they check the general condition of the vessels and spot check vessel documents to see if the Safety Management System is being complied with.

6. Bouchard Transportation Safety Management Manual section 10.14 provides detailed instructions for Anchoring Procedures. It specifically mentions the principles of operation and directions for dropping and retrieving the anchor. 10.14.3, is a summary of the above mentioned Federal Regulations, 33CFR 110.155. It gives additional specific direction to its Mates and Masters and summarizes the requirements in Section (b) that states "Operating Procedures to Comply with Federal Regulations", that would

obviously include anchoring in marked cable area shown on a Government Chart. (B 4621)

7. Bouchard relies on vessel personnel to make appropriate anchoring decisions consistent with their training, all applicable regulations and principles of good seamanship. Bouchard vessel personnel report general anchorage locations to dispatchers, but they do not provide specific anchoring coordinates.

8. Captain Yates' personnel record shows excellent performance over his career. He holds a 1600 ton masters license with an endorsement of Master of towing vessels. He has full STCW certification allowing him to sail in all waters domestic and international. He is a Designated Examiner, effective Dec 1, 2013 until December 31, 2018, for the assessment of candidates for towing vessel license. He is authorized by the U.S. Coast Guard to conduct assessments of their competence and to sign a candidates Towing Officer Assessment Record TOAR. He has received favorable recommendation from prior employers – it has been noted that he was a good boathandler and rehireable. He received a "Very Good" Performance Evaluation by Robert Glas and also a good evaluation by Jonathan Shaw, vessel supervisor: "Yates has been a great asset to Bouchard Transportation. His safety and performance is superb and all records are kept perfectly, he keeps the vessel in immaculate condition, free of clutter and debris. All equipment is always kept operating and with little to no problems he handles the vessel well. His communication and management ability with his crew members is also up to par. He manages the tug extremely well". (Yates Personnel File)

9. The Service, Training and Assessment requirements, and Testing to become a Master 1600 Gross Tons are substantial.

**Services Requirement:**
Per United States Coast Guard 46 CFR 10.412, 46 CFR 11.309 and 46 CFR 11.305 the minimum service required to qualify an applicant for a license as master of ocean or near coastal steam or motor vessels of not more than 1600 gross tons is:
- Four years total service on ocean or near coastal waters.
- Two years of the required service must have been on vessels of over 100 gross tons.
- Two years of the required service must have been as a master, mate master or mate (pilot) of towing vessels, or equivalent supervisory position while holding a license as master, mate master or mate (pilot) of towing vessels.
- One year of the service as master, mate master or mate (pilot) of towing vessels.

Given that a mariner generally sails for 6 months out of the year, it can take a minimum of 8 years in order to acquire the time for a 1600 ton Master of Oceans license. In reality it can take much longer.

**Training and Assessment Requirement:**

There are substantial training and assessment requirements for the position of Master 1600 Oceans license as per STCW AII/1 and AII/2 and as referenced within 46 CFR 11.309 and 46 CFR 11.305. It should be clearly stated that STCW requires a Knowledge, Understanding and Proficiency in the following subjects.

- Medical Care Provider, Radar Observer, Search and Rescue, Basic and Advanced Firefighting, Proficiency in Survival Craft, Visual Signaling, Bridge Resource Management, Terrestrial & Celestial Navigation and Electronic Navigation Systems, Watchkeeping to include COLREGS and IMO Marine Communication Phrases, Cargo Handling & Stowage, Shiphandling, Stability and Ship construction, Meteorology, Advanced Shiphandling, Advanced Stability, Advanced Meteorology, Management of Medical Care and Leadership & Managerial Skills.  In addition, if the mariner is serving on vessels equipped with ARPA, ECDIS or GMDSS, they will require additional training and assessment for each.
- A Master 1600 GRT Oceans with STCW further must show proficiencies in over 70 required assessments for becoming an STCW Mate and an additional 52 assessments to become an STCW Master.
- Relevant to this case, a Master must specifically exhibit knowledge and understanding, and demonstrate proficiency in maneuvering his vessel and anchoring while considering depth of water, type of bottom, wind and current, **bottom obstructions,** room to swing, place to anchor, courses and maneuvers to the anchor site, desired final heading, expected weather for the time at anchor, and whether tug assistance will be required. (Enclosure (2) to NVIC 11-14, 9.8A)
- To receive the Master of Towing endorsement, there are additional assessment requirements (approximately 100) per NVIC 4-01 which must be accomplished through a Towing Officer Assessment Record (TOAR).

**Examination for license:**

In addition to the Classroom Training and Assessments above, the mariner must pass a required USCG examination. Among the many competencies required for testing for a 1600 ton Masters license and Master of Towing Vessels is Terrestrial Navigation. The subject matter for a Coast Guard license is contained in 46CFR 10.910. It requires that a candidate for the license be tested for competency in working with charts, including definitions, datum, projections, and symbols, and also extracting information from charts and publications as well as voyage planning. Specifically, the examination topics

7

include testing in charts, navigation, publications, and Notices to Mariners. And under Ship Maneuvering and Handling: anchoring and mooring. Captain Yates obviously had the training and experience necessary to pass this stringent testing in the process of obtaining his license.

10. Above and beyond the training, assessment, and testing requirements listed above, Captain Yates was evaluated by the National Maritime Center and was determined to be qualified and approved as a "Designated Examiner" (DE) for assessment of competence of candidates for towing vessel licenses. This towing vessel assessment is known as the Towing Officer Assessment Record (TOAR). In performing this function, he is required to witness the skills and ability of license candidates to be competent in over 90 different tasks designated by the Coast Guard. The DE uses established criteria and his professional judgment to determine whether the candidate has demonstrated an acceptable level of proficiency. (Enclosure (2) to NVIC 03-16) The tasks relevant to this case are:

    a. Task No. NCO-B.9 **Identify and maintain required charts and publications.** The DE is required to have the mariner identify and maintain charts or maps and publications in accordance with 33 CFR 164.72, extract relevant information from publications, and make corrective changes to required charts or maps to incorporate the latest information on the area of operation.

    b. Task NO. NCO-B.10 **Use required charts and publications.** The DE is required to have the mariner extract and apply during a voyage relevant information from various sources such as tide and tidal current tables, Light List, U.S Coast Pilot, charts, and notices to Mariners, and/or Local Notice to Mariners (LNM), and Army Corps of Engineer Navigation Bulletins (as applicable).

    c. Task No. NCO-D.15 **Anchor the tow.** The DE is required to have the mariner describe the procedures for anchoring the vessel and tow taking into account prevailing conditions such as water depth, type of bottom, bottom contours, speed of current, tide, type of anchoring equipment, condition of tow (light or loaded), and scope of chain or wire. Have the mariner safely anchor the vessel per the Master's orders.

11. In reviewing of the Standards of Competence as established by CFR and STCW, the following CFR, STCW, and TOAR Training and Assessment requirements are specifically relevant to this case.

| Regulation | Competence | Assessment |
|---|---|---|
| STCW AII/1 and NVIC 12-14 | Knowledge of anchoring | Task 9.5A |
|  |  |  |

8

| STCW AII/2 and NVIC 11-14 | Demonstrate Anchoring a vessel | Task 9.8A |
|---|---|---|
| NVIC 11-14 Enclosure 4 | Maneuver and Handling a Ship in All Conditions | |
| NVIC 11-14 Part 4 | Guidance on Watchkeeping at Sea | |
| TOAR Enclosure (2) NVIC 03-16 | Maintain charts, use charts, Anchor the tow | Task No. NCO-B.9 Task No. NCO-B.10 Task No. NCO D.15 |
| | | |

*Table 1*

12. American Waterway Operators (AWO) is a towing industry trade association made up of over 300 U.S. towing companies nationwide. AWO has certified over 80% of the tugs and barges in the United States through a system of auditing its management and equipment.  The AWO Responsible Carrier Program (RCP) is a set of standards, procedures, and guidelines intended to improve marine safety and environmental protection in the tugboat, towboat and barge industry. The program aims to accomplish this objective by establishing preferred industry operating principles and practices as voluntary standards of conduct for tugboat and towboat companies. The standards outlined in the Responsible Carrier Program meet or exceed current governmental standards for the operation of barges and towing vessels. The Coast Guard has accepted the RCP as a Towing Safety Management System (TSMS) under the recent adoption of Subchapter M and it is recognized as a best-in-class safety management system. A thorough review of the RCP standards will not reveal any requirement that companies provide specific training regarding reading or interpreting charts. They do not require that companies provide specific training regarding selection of appropriate anchorage areas. They do not require that companies specifically monitor the anchoring locations of their vessels to verify that boats are anchoring in appropriate locations. And they do not require that companies provide specific instructions to the boats regarding specifically where to anchor.

13. I have contacted operations personnel at several towboat companies including Dunlap Towing, Western Towboat, American Navigation, Foss, Crowley Maritime, and Young Brothers, and inquired about their current in house procedures and training for anchoring mentioned in observation #11. None of these companies require specific training, oversite of their vessels anchoring practices, or provide specific instructions for

9

anchoring. During my career I worked at Dunlap Towing, Harley Marine Services, and Crowley Maritime Corporation. I was responsible for editing and revising Operation Manuals at each of those companies. Likewise none of these manuals included requirements for oversite and training in anchoring practices.

## Opinions

1. Ellen S. Bouchard and the Barge B 280 were necessarily fitted to perform the job of anchoring. The Tug and Barge were fitted with all necessary equipment and materials to allow those on board to make appropriate decisions regarding anchoring locations. Both vessels were seaworthy and there were no deficiencies in the tug or barge that played a part in the decision regarding the anchoring on January 6th, 2014.

2. The Ellen S. Bouchard and Barge B No. 280 are separate vessels, fully capable of operating independently from one another.

3. Bouchard anchoring procedures and guidelines as outlined in SMM 10.14 were in all respects adequate and it is my opinion they are well above industry standards. They not only mention specific operating instructions for the physical act of lowering and raising the anchor but remind and caution the Mate and Captain to comply with all Federal Regulations. (see observation #4 and #6)

4. The USCG and International Minimum Standards for training and sea service to become a Master on a Towing Vessel are extremely high. (observations 8, 9, 10, 11) This mariner not only had his United States Coast Guard license, but the USCG has also deemed that Captain Yates was STCW Compliant. Being STCW certified demonstrates that the Mariner has the knowledge, understanding and proficiency in the competence of anchoring a vessel (as depicted in Table 1, Observation #11). In my opinion, Bouchard Transportation had a reasonable assumption that Captain Yates was trained and assessed in the area of anchoring, and specifically what areas to avoid. Yates' decision to anchor in the cable area was a navigational error on the part of an otherwise qualified officer.

5. There was nothing in Yates' personnel file or work history with Bouchard from which Bouchard could have reasonably anticipated that he would anchor the vessel in a designated cable area or in violation of Federal regulations.

6. There is no requirement, no practice in the industry, and in my view, it is not necessary for management to provide training regarding reading or interpretation of charts or selection of proper anchorage locations. My view is that companies, like Bouchard, are entitled to rely on the Coast Guard license, Towing Master's certification and the STCW

10

certification as a representation that licensed officers are properly trained and qualified on all the topics necessary to perform the job, which includes reading charts and choosing a proper anchorage.

7. There is no requirement, no practice in the industry, and in my view, there is no need for Bouchard to monitor anchoring locations to verify that vessels were in fact anchoring in proper locations. (Observation #12) My opinion is that it is reasonable for Bouchard to rely on vessel personnel to make appropriate decisions regarding anchorage locations, consistent with regulations and consistent with principles of good seamanship.

8. My opinion is that companies like Bouchard, are entitled to rely on the Coast Guard license as a representation that licensed officers are properly trained and qualified on all the topics necessary to perform the job, which includes reading charts and proper anchoring procedures. (Observations 8, 9, 10, 11)

9. There is no requirement, no practice in the industry, and in my view, it is not necessary for management to provide instructions to vessel personnel regarding specific anchorage areas. In my view the vessel personnel know the characteristics of the boats, the weather conditions, and the waters involved, and in my view, are in a better position than office personnel to select an appropriate location. My opinion is that it is reasonable for Bouchard to rely on licensed officers to make appropriate anchoring decisions consistent with applicable regulations and principles of good seamanship.

I reserve the right to amend this report should further information become available.

Respectfully submitted,

R. Russell Johnson

**Captain R. Russell Johnson**
**RJ MARITIME ASSOCIATES, LLC**
465 Davis Bay Road
Lopez Island, Washington 98261
360 468-2655
cell 425 418-9487

## SEAGOING EXPERIENCE

2000 – 2012    **Vessel Piloting, Safety, Training, Evaluation, and Regulatory Compliance. Dunlap Towing Co.**, Everett, Washington
- Company emergency relief Master. West Coast, Alaska, Asia, Russia.
- Assist and train Masters piloting vessels Southeast and Western Alaska.
- Master of Company salvage vessel, "Salvage Chief", from 2000 to 2006.
- Train and evaluate senior Captains and Mates onboard vessels.
- Certified U.S. Coast Guard onboard Designated Examiner.

1997 –2000    **Vessel Master, Piloting, Training, and Evaluation, Harley Marine Services,** Seattle Washington.
Emergency relief Master of various company vessels. On board training and evaluation of Captains and Mates. This experience in addition to full time shoreside management duties.

1994 – 1997    **Vessel Master, Dunlap Towing Co.**, Everett, Washington
Master of various company vessels. Areas of operations: Alaska, West Coast of U.S., Hawaii.

1984 – 1994    **Piloting, Training, and Evaluation, Crowley Maritime Corp.**, Seattle, WA.
Piloted various company equipment up to 7200 h.p. tugs and 650 ft. barges. Conducted on board training and evaluation of Masters and Mates in addition to management duties.

1976 – 1984    **Master, Crowley Maritime Corp.**, Seattle, WA.
Master of tugs up to 7200 h.p. and barges to 650 ft. in length. Experience includes ship tows to 950 ft., drill rigs, petroleum barges to 150,000 bbls., dry cargo barges, Ro-Ro barges, Hydro train barges, and harbor assist work. Geographic experience includes all U.S. West Coast Ports, U.S. East and Gulf Coast ports, Central, Western, Arctic Alaska (and inside passage waters Southeast Alaska), Hawaii, Guam, Wake Island, Asia, Persian Gulf, Red Sea, Suez Canal, India, Egypt, Italy, France, Puerto Rico, and Panama.

1967 – 1975    **Master, PAC Lines**, Seattle, WA.
Master of tugs to 5000 h.p. Geographic experience includes all U.S. West Coast ports, Central, Western, and Arctic Alaska, U.S. East Coast and Gulf Coast ports, Hawaii, Asia, and Panama.

1

## SHORESIDE WORK EXPERIENCE

2012 - present  **RJ Maritime Associates, LLC**
- Maritime Project Management
  - Arctic ice navigation, reconnaissance, and management.
    2013, 2015 Foss/Exxon Point Thompson project
    2014 Faiweather/Choest/Shell Ice Pilot procurement project
    2016 Chouest/Shell anchor retrieval project, Chukchi & Beaufort Sea
    2016 Foss/Hillcorp rig delivery project, Pt. Oliktok
- Accident Investigation
- Legal Consulting

2000 – 2012  **Director, Safety, Training, & Regulatory Compliance, Dunlap Towing Co,**
- Responsible for safety, training, and evaluation of vessel personnel.
- Alaska ice reconnaissance and piloting
- Responsible for company compliance with International Safety Management (ISM) System and Responsible Carrier Program (RCP) of American Waterway Operators.
- Certified Internal Auditor for ISM audits.
- Company Security Officer responsible for vessel and company maritime security.
- Qualified Individual for Company Emergency Response. Certified Incident Commander.
- Qualified Instructor for Coast Guard licensing courses.
- Designated Examiner for signing Towing Officer Assessment Records (TOAR)
- Responsible for investigation of accidents and injuries and conducting Root Cause Analysis.
- Assisted in developed of Simulator Training Program at Pacific Maritime Institute for the training and evaluation of Mates and Masters and Puget Sound Pilots.
- Member U.S. Coast Guard Regional Quality Steering Committee (RQSC), Seattle.
- Served on AWO Regional Safety Committee 2000 to present. Elected to Board of Directors AWO 2007 to present. Elected Vice Chairman 2008.

1999 – 2000  **Director, Operating Services, Harley Marine Services.** Seattle, WA
Staff responsibility for operations of all Harley Marine Services companies.
Responsibilities included safety, training, and auditing.

1997 – 1999  **General Manager, Westoil Marine, Gabon, Africa**
Formed crude oil transportation company in Gabon, Africa. Developed successful operating plan for Chauvco International, Inc., Calgary, Canada to deliver product from oil production wells to offshore storage tanker and arrange transfer to western markets.

1990 – 1994  **Pacific Region Manager, Operations, Crowley Marine Services,**
Responsible for management of Marine Operations Department, and for all outside towing operations for the Pacific Region, Alaska Arctic to California.

1988 – 1990  **General Manager, Red and White Fleet, Crowley Maritime Corporation, San** Francisco. Profit and loss responsibility for passenger service company.

2

1985 – 1990    **General Manager Harbor Tug and Barge, Crowley Maritime Corporation**, San Francisco. Responsibility for harbor operations.

## EDUCATION

Bellarmine Prep, Tacoma, Washington
Seattle University, Seattle, Washington
College of Marin, San Rafael, California
City University, Seattle, Washington

## PROFESSIONAL CERTIFICATION AND TRAINING

1971 – Kildals Nautical School, Seattle, Washington
        1600 ton Ocean Masters License
1982 – Consulted in the development of Simulator Training Program for Mates and Masters. Kings Point Maritime Academy.
1984 to 1985 – Trained over 50 Mates and Masters in boat handling, situational awareness, and bridge resource management at Kings Point Maritime Academy.
1991 – Hartec Management Consultants, Seattle, Washington
        Hazardous Waste and Emergency Response Training
1991 - International Loss Control Institute (ILCI) 2 day course
        Loss Control and Safety Auditing
1992 – Incident Management Associates, Seattle, Washington
        Incident Command System Training
1992 – Sam Sacco and Associates, Seattle, Washington
        Media Crisis Training
2000 – Pacific Northwest Maritime Institute. Seattle, Washington
        Advanced Training Global Maritime Distress and Safety Systems
2000 – Fremont Maritime Services, Seattle, Washington
        Basic Safety Training 5 day course including firefighting and survival.
2000 – Pacific Northwest Maritime Institute, Seattle, Washington
        Bridge Resource Management training
2001 - Pacific Northwest Maritime Institute, Seattle, Washington
        ARPA Training
2002 – Seattle Maritime Academy, M/T Consulting. Seattle, Washington
        40 Hour Train the Trainer for certification of USCG Qualified Instructor.
2002 – Received U.S. Coast Guard Citation for Meritorious Service in the analysis of crew alertness and fatigue on board commercial towing vessels operating on the West Coast of the United States
2003 – Crisis Management Training, Seattle, Washington
        Charles L. Webster & Assoc.
2003 – Crew Endurance Management Coaches Training. Seattle, Washington

B.R. Emond, U.S. Coast Guard

2003 – Completed 10 hour Occupational Safety and Health Training Course in General
        Industry Safety and Health

2004 – Assisted in development of Simulator Training Course at Pacific Maritime
        Institute, Seattle, Washington. For training of Mates and Masters in
        Navigation, Boat handling, and Bridge Resource Management.

2004 – Security Officer Training: Port, Company, & Ship
        Pacific Maritime Institute. Seattle, Washington

2004 – Internal auditors training International Safety Management (ISM) System
        Gary Schmidt, SQE Consulting

2005 – Assisted in development of simulator based Puget Sound Pilot Testing and
        Evaluation at Pacific Maritime Institute, Seattle, WA.

2005 – Incident Command System Training
        American Environmental Services

2006 – Certified as "Designated Examiner" for assessment of competence of candidates
        for towing licenses.

2008 – Recertified as "Designated Examiner" for assessment of competence of
        candidates for towing licenses.

2010 – Continued participation on behalf of Dunlap Towing co. to the Pacific Regional
        Quality Steering Committee, a safety partnership of the U.S. Coast Guard with the
        American Waterway Operators.

2010 – Received Safety Management System Training with emphasis on Risk Assessment and Safe
        Management Practices.  Pacific Maritime Institute, Seattle Washington.

2011 – Received U.S. Coast Guard approval as "Qualified Instructor" for 16 different licensing courses
        at Pacific Maritime Institute, Seattle, Washington. Courses include Seamanship,
        Shiphandling, Radar, Bridge Resource Management, Navigation, Rules of the Road,
        Watchkeeping, and Officer in Charge of a Navigation Watch.

2011 – Qualified to assess candidates for STCW endorsements in those areas that I have approval to
        teach as a Coast Guard approved "Qualified Instructor".

2011 – Received Root Cause Analysis and Incident Investigation training and certification. America
        Bureau of Shipping Marine Industry RCA/Incident Investigation Course.

2013 – Recertified as a "Designated Examiner" for assessment of competence of
        candidates for towing license.

2016 – Renewed for Continuity purposes 1600 Ton Masters license and Master of Towing
        Vessels for 10th issue of same.

4

LIST OF TESTIMONY CASES
CAPTAIN RUSS JOHNSON

1. McGregor v. Westar. Retained by Cox, Wootton, Griffin, Hansen, Poulos, LLP. (Dick Wootton) District Court Northern California. Case # CV-05001-SC. Testimony at trial, July, 2010

2. Sisson vs. Ocean Marine. Retained by Beard, Stacey, & Jacobsen. (Jim Jacobsen) King County Superior Court. Case # 09-2-20985-5 April 27th, 2010. Testimony at deposition, office of Bauer, Moynihan, and Johnson. Opposing lawyer Tom Waller.

3. USCG vs Scoto. Retained by Cox, Wootton, Griffin, Hansen, & Poulos. (Terry Cox) Administrative Law Judge, Coast Guard Hearing. Long Beach, California. Case No: 3648094, ALJ Docket Number 2010-0049. August, 2010. Testimony at trial.

4. Blue vs. Bruscoe. Retained by Cox, Wootton, Griffin, Hansen, & Poulos. (Galin Luk, Courtney Crawford) Superior Court State of California. County of Alameda. Case #RG 09488804. December, 2010. Testimony at deposition and trial.

5. Flora vs. Coastal Villages. Retained by Beard, Stacey, Jacobsen. (Joe Stacey) District Court for the Western District of Washington. Case # CV09-01768. December, 2010. Testimony at deposition and trial.

6. Kahue vs. Pacific Environmental. Retained by Cox, Wootton, Griffin, Hansen, Poulos. (Dick Wootton). District Court of Hawaii. Case No: CV 10-00001 LEC-KSC. Retained September, 2011. Testimony at deposition.

7. Dutra/Manson JV vs. Westar. Retained by George Nowell. Northern District Court of California. Oakland Division. Case No. CV 083195 PJH. Testimony at deposition on November 14, 2011

8. Easly vs. Fresco Shipping. Retained by LeGros, Buchanan, and Paul. (Marc Warner). U.S. District Court Western Washington. Case: CV – 00167RSL. For the Defense. Retained April, 2011. Testimony at trial. Federal Court, Seattle. Judge Laznic.

9. Avila vs. Catalina Freight Lines. Retained by James Marissen, Kessal, Young, and Logan. For the Defendant. May, 2012. Testimony at deposition and trial. U.S. District Court, Central District of California. Case No. CV11-0336 PA (Ex) Opposing lawyer Peter Forgie.

10. Hedges vs. Foss. Retained by Barbara Holland. Garvey, Schubert, Barer. For the Defendant. August, 2012. Testimony at deposition. Opposing lawyer Rob Kraft. U.S. District Court for the Western District of Washington. Case # C10-5046RBL.

11. MacLay vs. M/V Sahara. Retained by Kevin Smith. For the Defendant. October, 1012. Testimony at deposition. Opposing lawyer J.D. Stahl. Testimony at trial. Seattle Federal Court, April 18th, 2013.

12. Blarney vs. Ridge Contracting. Retained by Larry Altenbrun. Nicoll, Black, and Feig. For the defendant. Testimony at deposition. Opposing lawyer Mark Scheer. US District Court of Alaska. June 20th, 2013. Case #3:12 CV-00097-SLG.

13. Selhorst vs. Alward Fisheries, LLC. Retained by Andy Miesell and Russ Winner. For the Plaintiff. Testimony at deposition. Opposing attorney Eric McVittie, LeGros, Buchanan, & Paul. US District Court of Alaska. June 18th, 2014. Case # 3:12-cv-00133-TMB.

14. Amavisca vs. Foss. Retained by Glen Piper and Sean Cooney. Keesal, Young, & Logan. For the Defendant. Testimony at trial. December 3, 2014. Opposing attorney Edward Bull. United States Central District Court of California. Case No. 2:3-cv-03550 FMO (RZx).

15. Collins vs. Ballard Marine Construction. Retained by Jim Jacobsen. For the plaintiff. Testimony at deposition, March 13, 2015. Chris Reilly of Nicoll, Black, and Feig for the defense. Superior Court State of Washington, King County. No. 14-2-01596-8 SEA

16. Hooke vs. Foss Maritime. Retained by John Giffin. Keesal, Young, Logan – S.F. For the defendant. Testimony at deposition. March 19th, 2015. John Hillsman for the plaintiff. District Court Northern California. Case # C 13-00994 JCS

17. Hofseth vs. Phoenix Processor LTD. Retained by Joe Stacey. Beard, Stacey, Jacobsen. For the Plaintiff. Testimony at deposition. April 17th, 2015. Nathan Beard for the defendant. Superior Court State of Washington. Case # 13-2-10808-7-SEA.

18. Palma vs. Kirby. Retained by Glen Piper. Keesal, Young, and Logan – Los Angeles. For the Defendant. Testimony at deposition. October 9th, 2015. Curt Mickelow for the Plaintiff. Superior Court State of California, Los Angeles-Central District. Case # BC521998.

19. Gruzlewski vs Starbound, LLC. Retained by Joe Stacey. Beard, Stacey, Jacobsen. For the Plaintiff. Testimony at Deposition. January 15th, 2016. Defense lawyer Dustin Hamilton for LeGros, Buchanon, Paul. Superior Court State of Washington, King County. Case No. 15-2-08749-5 SEA

20. Protz vs Hicks et al. Retained by Joe Stacey. Beard, Stacey, Jacobsen. For the Plaintiff. Testimony at deposition. Defense lawyer John Wiegenstein, Heller Wiegenstein. June 15th, 2016. Superior Court State of Washington, King County.  Case No. 15-2-01140-5 SEA

21. Tabingo vs American Triumph. Retained by Joe Stacey. Beard, Stacey, Jacobsen. For the Plaintiff. Defense lawyer Marcus Oberg, LeGros, Buchanan, & Paul. Testimony at deposition, June 28th, 2016. Superior Court State of Washington, King County.

22. Cook vs Pacific Storm. Retained by Stacey, Jacobsen. For the Plaintiff. Defense lawyer Bert Markovich. Schwabe, Williamson, Wyatt. Testimony at Deposition, April 19,2017. Superior Court of State of Washington, King County.

23. Buckeye Pennsauken Terminal, LLC vs Vane Bros. For the Plaintiff. Defense lawyer James Johnson. Ricci, Tyrell Johnson & Grey. Testimony at Deposition, May 10th, 2017. Philadelphia, Pennsylvania.

*R. Russell Johnson*
*RJ Maritime Associates, LLC*
*465 Davis Bay Road*
*Lopez Island, WA*
*98261*
*425 418-9487*

---

# Services Rates
### Effective April 1st, 2017

**Consulting Services:**                                    $275/hour
- Investigation, reviewing file documents
- Conferences with counsel, discussions with witnesses
- Preparing and writing opinions
- Equipment inspections

All day (8 hours or more) or overnight travel for above services:   $2200/day

**Testimony:**                                              $350/hour/min. 4 hrs.
- Attending depositions or being deposed
- Trial testimony and trial participation
- Attendance at arbitration or mediation
- Associated travel for any of the above

All day (8 hours or more) or overnight travel for above services:   $2600/day

**Other Travel:**                          $150/hour

**Retainer:**                              $2000

Out of pocket expenses incurred, such as travel expenses, parking, mileage, and copying, will be billed at actual cost.

9/1/05

# EXHIBIT 2

**R. Russell Johnson**
**RJ Maritime Associates, LLC**
465 Davis Bay Road
Lopez Island, Washington 98261

Date: April 5th, 2018
Subject: Power Authority of the State of New York vs Bouchard Transportation Co.

## SUPPLEMENTAL EXPERT REPORT

I have been asked by Wayne Meehan of the law firm Freehill Hogan & Mahar, LLP to offer a supplemental opinion and rebuttal to the expert report submitted by Fisher Maritime. My original report is incorporated herein, including my qualifications, list of prior experience, prior testimony and fee schedule.

In preparation for this report I have
- Reviewed the Expert Report of Richard DiNapoli
- Inspected the Tug Ellen S. Bouchard and the Barge No. 280 on April 4th in the Port of Bayonne and visited the Bouchard Transportation dispatch office on Long Island on the same day.
- Discussed this matter with Operations personnel from the following East Coast Maritime Companies: Moran Towing Corporation and McAllister Towing.

Based on this experience and the review of the above-mentioned documents I have arrived at the following additional observations and opinions:

**Observations:**
1. I inspected the tank barge No. 280 at 0900 hrs on April 4th. Tankerman Keith Reiners was on duty aboard the Barge No. 280 when I boarded on April 4th. Mr. Reiners is the same tankerman that was on duty when the barge anchor was retrieved on January 6th, 2014. We discussed the events and anchoring procedures of that day and his description to me was consistent with his statement and deposition in this matter. I found the anchor winch and supplemental gear to be in good condition and well maintained. He has had the opportunity to anchor many times in the past and on this particular run. He confirmed to me that neither he nor fellow tankerman Eric Thomas have any input on the decision of where or when to drop the anchor. They simply follow orders from the Captain of the tug. In fact, they often have no idea where they are anchoring at the time as they do not have any means nor reason to follow the route of the tug and barge. Mr. Reiner confirmed that although the anchor was replaced since January 2014, the barge configuration and anchoring equipment onboard at the time of my inspection was the same as on January 6, 2014.



1

2.  I boarded the Tug Ellen S. Bouchard at 1020 hrs. on the same day as the barge inspection. Chris Smith was the Captain on duty at the time. The vessel computers have internet access. He was able to display a Code of Federal Regulations library that is available to the Captain and ship officers on all three of the tug's computers. (one in the raised wheelhouse and two in the main wheelhouse.) The Captain and Mates have full access to all relevant CFR's including 33 CFR's 110.1, 110.60, and 110.155 that govern the general and special anchorage areas of Long Island Sound. The Coast Pilot 2 is also physically on board in paperback that covers the geographic area from Boston to the Port of New York. These volumes specifically note the geographic anchorage areas that are approved for anchoring and the assorted regulations for their use. The tug also had access to Chart No.1 that describes all chart datum and symbols.

    Captain Smith was on vacation at the time of the incident on January 6, 2014, but was assigned to the Ellen S. Bouchard as mate during the 2014 time frame and was familiar with the equipment, publications and information that were onboard at the time of the incident. He confirmed that the tug had the same equipment, publications and information at the time of my visit as in January 2014. Captain Smith always informs the dispatch office when they drop anchor and when they retrieve it. However, Captain Smith informed me that he never gives the dispatch the precise co-ordinates of the position nor do they require it. They only report the basic geographic area, i.e. Bay Ridge Flats, Gravesend, Perth Amboy, etc. This was the same practice in January 2014.

3.  At the time of my tug inspection, I noted a spare set of push wires located on each side of the vessel that was used for pushing barges other that the No. 280. I also noted that the tug had a tow winch. Captain Smith advised that now (and at the time of the incident) the tug and tow are always separated during cargo operations and I witnessed this firsthand during my attendance onboard.

4.  At 1500 hrs. on April 4th I met with head dispatcher, Keith Shannon, of Bouchard Towing, at their main office on Long Island. I was able to discuss dispatch procedures relevant to this case and review the use of the Port Vision screen located in the dispatch office. Currently and in January of 2014, the Port Vision system was used in the satellite mode. The satellite mode provides only a Google earth presentation that provides no information which would place Bouchard management on notice if vessels were anchored in prohibited areas.

5.  Keith Shannon confirmed to me that the dispatchers do not question the Captains' decision to anchor, especially in an emergency due to low visibility conditions that prevailed on the morning of January 6th. Nor do they provide specific instructions regarding anchoring information in the event that a tug Captain chooses to anchor his vessel. The dispatchers serve as an intermediary between the customer and the vessels and simply relay berthing and cargo orders. They have no responsibilities with respect to navigational issues.

2

6. Keith Shannon also related to me that they frequently utilize the Tug Ellen S. Buchard for duties other than pushing the Barge No. 280. As an example, the vessel is used for assisting other barges and ships into docks and can be used to push barges other than the No. 280. The Ellen also has a tow winch for towing non ATB barges on the tow wire. The push wires located on each side of the vessel also allow the Ellen to adjust the tow for several different barge pushing configurations.

7. On April 4th and 5th I discussed the issues of this case with senior operations managers from Moran Towing and McAllister Towing. As the West Coast Companies had responded in my initial report, (Original report, observation #13) none of these companies require specific training, oversite of their vessels anchoring practices, check their specific anchorage co-ordinates, provide specific instructions for anchoring, or provide specific information or guidance regarding anchoring regulations applicable in particular locations.

**Captain DiNapoli Report:**

1. DiNapoli continually questions Captains Yates "training, competence, and qualifications" throughout his report. He also claims that Bouchard failed to recognize this lack of "training, competence, and qualifications." He bases this opinion on the singular event that led to this incident: dropping an anchor in a cable area. What DiNapoli fails to recognize are the following:

   a. Captain Yates had a spotless record prior to this incident and that Bouchard management had no reason to suspect that Yates would perform this act.
   b. Captain Yates had training and assessments directly relating to anchoring procedures under the requirements of his 1600 ton Masters license. He was required to know how to anchor a tow, how to read charts and publications, and recognize chart datum and symbols. Captain Yates was also qualified by the U.S. Coast Guard to train other applicants for towing vessel licenses in the practice of anchoring. (Initial expert report 3/1/18) With these credentials, Bouchard had every reason to trust Captains Yates decisions and not question his training, competence and qualifications.

2. DiNapoli states that the waters of and around Hempstead Harbor are a part of the waters of the Port of New York and anchoring outside of expressly designated anchorage areas is expressly prohibited. (DiNapoli, #30) That is not a true statement. It is not expressly prohibited and anchoring in Hempstead Harbor is not necessarily a violation of 33 CFR 110.155.

3

3. DiNapoli states that Bouchard failed to provide guidance to its tugboat Captains and Mates that anchoring outside of designated areas in those waters was expressly prohibited by applicable statutory regulations and to provide applicable 33 CFR regulations for anchoring in the Port of New York Harbor. (DiNapoli 53) As a matter of fact, the vessels owned by Bouchard Towing travel thousands of miles and call at hundreds of ports in the United States on a daily basis. Those voyages and ports encompass areas where literally thousands of statutory regulations must be adhered to. It would be virtually impossible for Bouchard Towing or any towing company to advise its Captains on the regulatory requirements for every area and port of operations. That's is why Bouchard (as well as all other responsible carrier companies that I am aware of) provide guidance to their Captains by providing charts, CFR libraries, Coast Pilots, and other publications to assist in their navigation and decision making and rely on the Coast Guard to provide the necessary training to access the information.

**Conclusions and Opinions:**

1. It is my opinion Captain Yates made a judicious decision to seek a safe anchorage given conditions of zero visibility. The nearest anchorage was Hempstead Harbor. Hempstead Harbor, outside of the cable area, offers a reasonable anchorage area in the prevailing conditions. Bouchard Towing had no reason to believe that Captain Yates would make the decision to anchor in a cable area. Yate's decision to anchor in the cable area was a navigational error on the part of an otherwise qualified and fully credentialed officer.

2. As stated in my previous opinion the tug Ellen S. Burchard are separate units fully independent of each other. They are capable of and frequently do detach from each other to perform separate functions. Bouchard dispatch utilizes the tug to assist other vessels and tow other barges as exhibited by the push wires located on the tug and availability of a tow winch to tow other barges.

3. Bouchard Towing provides their tugs with all charts, publications, and regulations necessary to perform their operations. (Observation #2) There is no requirement, no practice in the industry (as exhibited in my polling of other towing companies), or in my view is it necessary for companies to provide training regarding reading or interpretation of charts, selection of proper anchorages,  oversite of chosen anchorages or provide specific information or guidance on anchoring regulations applicable in specific locations.

4. Bouchard Towing provided all necessary tools and guidance to their Captains to enable them to perform their duties which includes interpreting charts and making appropriate anchoring decisions. (observation #2)

5. Anchoring in Hempstead Harbor, outside the cable area, would not have been a violation of 33 CFR 110.155.

4

I reserve the right to amend this report should further information become available.

Respectfully submitted,

R. Russell Johnson

# EXHIBIT 3

1

2      UNITED STATES DISTRICT COURT

3      SOUTHERN DISTRICT OF NEW YORK

4
       IN THE MATTER OF THE COMPLAINT OF

5
       BOUCHARD TRANSPORTATION CO., INC.,
6      MOTOR TUG ELLEN S. BOUCHARD, INC., and
       B. NO. 280 CORPORATION,
7
       AS OWNERS, OWNERS PRO HAC VICE
8      AND OPERATORS OF THE:
                                     CASE NO.
9                                    14-CV-1262 (PAC)

10     BARGE B. NO. 280 and
       TUG ELLEN S. BOUCHARD.
11
       -------------------------------------------
12
       POWER AUTHORITY OF THE STATE OF NEW YORK,
13
               Plaintiff,
14
           -against-              CASE NO.
15                                14-CV-4462 (PAC)

16     THE TUG M/V ELLEN S. BOUCHARD,
       and the Barge B. No. 280,
17     their engines, apparel, tackle, boats,
       appurtenances, etc., in rem, and
18     Bouchard Transportation CO., INC.,
       MOTOR TUG ELLEN S. BOUCHARD, INC.,
19     and B. No. 280 CORP., in persona,

20
               Defendants.
21
       -------------------------------------------
22                     TRANSCRIPT OF
           DEPOSITION OF CAPTAIN R. RUSSELL JOHNSON
23
       Date:  Wednesday, May 16, 2018
24     Time:  10:00 a.m.
       Place:  New York, New York

25

Captain R. Russell Johnson
05/16/2018                                              6

```
 1                 Captain Russell Johnson
 2       A       360-468-2655.
 3       Q       Okay.  Do you have a current
 4  employer?
 5       A       I am self-employed.
 6       Q       Self-employed.  And do you have
 7  your own business?
 8       A       I do.
 9       Q       What is the name of the business?
10       A       RJ Maritime Associates LLC.
11       Q       Does anyone else work with you?
12       A       No.  I am sole -- sole -- sole --
13  sole proprietor.  That's the term I want to use.
14       Q       And you understand that your
15  testimony here is being recorded by the court
16  reporter, right?
17       A       I do.
18       Q       So the court reporter can only take
19  down one of us speaking at a time.  So I am going
20  to for you to wait for me to finish my questions
21  before you answer, and I will wait for you to
22  finish your answer before I ask you the next
23  question.  Okay.
24       A       I understand.
25       Q       If you don't understand one of my
```

Captain R. Russell Johnson
05/16/2018                                                    11

```
 1                Captain Russell Johnson
 2    for this expert report?
 3         A     Yes.  Pretty much.
 4         Q     And when you say the -- your
 5    "professional opinion as to the circumstances
 6    surrounding," what does that refer to?
 7         A     Well, it refers to, you know,
 8    examining the voyage and how they came to arrive
 9    in Hempstead Harbor.
10         Q     Okay.
11         A     And the individuals involved and
12    the general circumstances.
13         Q     Okay.  Of the anchoring?
14         A     Of the anchoring and the voyage.
15         Q     Okay.  Now, what is your area of
16    professional expertise for this case?  What area
17    are you an expert in?
18         A     Well, a couple of different areas.
19    I have been a captain for going on 50 years, a
20    tug boat captain.  And I have had, in addition to
21    that, at least 25 years of management, operations
22    management, in a senior position in operations
23    for three different tow boat companies.
24                And I have also served on the board
25    of directors from the American Waterway
```

Captain R. Russell Johnson
05/16/2018                                          24

```
 1                  Captain Russell Johnson

 2       Q       Okay.  Anything else?

 3       A       No.

 4       Q       And when you reviewed these federal

 5   regulations for the Port of New York, is that the

 6   first time that you have looked at those for this

 7   case?

 8       A       Yes.

 9       Q       Are you offering yourself as an

10   expert in the federal regulations for anchoring

11   in the Port of New York?

12       A       In the portion that I read.

13       Q       So you read parts of the CFR, and

14   that --

15       A       You know, I wasn't -- I actually

16   wasn't asked to be an expert on the CFR.  I was

17   not asked.

18       Q       Okay.

19       A       And -- and I am not going to

20   comment as an expert on those CFRs.

21       Q       So you are not an expert in the

22   Code of Federal Regulations --

23       A       No.

24       Q       -- and --

25       A       And I don't believe.
```

Captain R. Russell Johnson
05/16/2018                                                    25

```
 1                  Captain Russell Johnson

 2       Q       You've got to let me finish.

 3               MR. MEEHAN:  Let him finish.

 4       Q       -- Code of Federal Regulations for

 5  anchoring in the Port of New York that have been

 6  marked as Johnson Exhibit 4, right?

 7       A       Right.

 8       Q       Did you review the chart in this

 9  case where the anchoring occurred?

10       A       I did.

11       Q       Let me show you a chart that has

12  been marked at previous depositions in this

13  matter.  We will see here it's marked with Yates

14  Exhibit 20, so at the Yates deposition, and

15  Hudgins Exhibit 36.

16               This is actually the original from

17  Hudgins because I see this exhibit marker is an

18  original, and that's a copy.

19               (Previously Marked Exhibit No.

20       Yates 20/Hudgins 36, Chart, Document is

21       introduced into the proceedings.)

22       Q       Do you know who Yates is?

23       A       I do.

24       Q       Who is that?

25       A       He's the captain of the vessel.
```

Captain R. Russell Johnson
05/16/2018                                                    37

```
 1                  Captain Russell Johnson
 2      West Coast of Los Angeles, San Diego.
 3          Q      On page two of your report, you
 4      also write:
 5                  "I have anchored hundreds of times
 6      in harbors worldwide utilizing the anchor gear on
 7      the barges."
 8                  Do you see that?
 9          A      Yes.
10          Q      Have any of those anchoring
11      procedures been performed in the Port of New
12      York?
13          A      No.
14          Q      Have you ever sailed in any
15      capacity in the waters of the Port of New York?
16          A      No.
17          Q      Has any of your experience involved
18      Northeast US service on a tug and tow?
19          A      Nothing north of Port of Baltimore.
20          Q      And when was the Port of
21      Baltimore -- or I assume you did serve on a tug
22      in the Port of Baltimore?
23          A      Yes.
24          Q      And when was that?
25          A      Late '60s.
```

Captain R. Russell Johnson
05/16/2018                                    44

```
 1                Captain Russell Johnson

 2    Dunlap?

 3         A      Yes.

 4         Q      You stayed there from 2000 until

 5    you retired in 2012?

 6         A      Correct.

 7         Q      Any other employment after 2012?

 8         A      Not other than my own business.

 9         Q      Your sole proprietorship with RJ

10    Maritime Associates?

11         A      Yes.

12         Q      And that's testifying as an expert

13    witness?

14         A      Not entirely, no.

15         Q      What else do you do at RJ Maritime

16    Associates?

17         A      Well, it says it right here in my

18    work experience, "maritime project management."

19    For the last four years until 2016, I was doing

20    arctic ice navigation reconnaissance and

21    management, which happened -- which occurred

22    every -- every summer from 2013, '14, '15, and

23    '16.  There was no work in 2017, and there is not

24    going to be any work this year.

25         Q      Okay.  So you are referring to page
```

```
1                    Captain Russell Johnson

2    two of your CV?

3         A      Yes.

4         Q      2012 to the present?

5         A      Yes.

6         Q      "Maritime project management"?

7         A      Yes.

8         Q      "Accident investigation"?

9         A      Yes.

10        Q      And "legal consulting"?

11        A      Yes.

12        Q      What do you for accident

13   investigation?

14        A      It's.  A lot of it is part of my --

15   my legal work, where I am asked to go in and

16   investigate an accident, self-explanatory.

17        Q      For what type of companies?

18        A      Maritime companies.

19        Q      Can you name some of the companies

20   that you have worked for between 2012 and the

21   present doing accident investigation?

22        A      Many of the cases that I have

23   worked on as part of accident investigation is

24   part of it.

25        Q      No, I'm asking you to identify the
```

Captain R. Russell Johnson
05/16/2018                                               46

```
 1                  Captain Russell Johnson
 2    companies that you have worked.
 3                  Do you work for companies, or do
 4    you work for some other entities?
 5         A     I usually work for the legal
 6    entities that are involved in it.
 7         Q     The law firms?
 8         A     Yes.
 9         Q     So a law firm retains you to do an
10    accident investigation?
11         A     Yes, as part of -- as part of my
12    services, yes.
13         Q     And that's usually involving some
14    maritime company, correct?
15         A     That's correct.
16         Q     Right.  Can you identify some of
17    the maritime companies that you have worked for
18    doing accident investigations from 2012 to the
19    present?
20                  MR. MEEHAN:  Look at your list if
21         you want.
22         A     Okay.  Well, this is my list of
23    testimony cases, which is not my list of
24    obviously all of the cases I've worked on.  But
25    we can -- we can --
```

Captain R. Russell Johnson
05/16/2018                                          47

```
 1                  Captain Russell Johnson
 2          Q      You can just identify them by
 3     number.  That's fine.
 4          A      Well, there is actually more to it
 5     than that.  But there is -- Westar is one of them
 6     in Seattle.  Foss, I have done several cases for
 7     Foss.  Foss, F-o-s-s.  Dutra/Manson, and Catalina
 8     Freight Lines.  Hawaii Tug and Barge.  Brucecoe.
 9                  There are some construction
10     companies that I worked for Ballard Marine -- no,
11     I'm sorry.  Strike that.
12                  Kirby.  American Tow Boat.
13          Q      Now, if we look at your list of
14     testimony in cases that you have identified,
15     there are three pages, 1 through 23.
16          A      Yes.
17          Q      Are those all of the cases in which
18     you have been retained as an expert?
19          A      No.  This is a list of testimony
20     cases, that testimony was given in either by
21     deposition or trial go.
22          Q      Okay.  So in each one of these
23     cases, 1 through 23, you testified either at a
24     deposition or at trial.
25          A      Correct.
```

Captain R. Russell Johnson
05/16/2018                                                48

```
 1              Captain Russell Johnson
 2         Q      Do any of those 1 through 23
 3   involve anchoring incidents?
 4         A      You are going to have to give me
 5   some time.
 6                I don't believe any of these cases
 7   involve anchoring.  However, I have -- I recall
 8   doing a couple of anchoring cases that were work
 9   that I did not give testimony in.
10         Q      Would that be in an accident
11   investigation case?
12         A      Yes.
13         Q      Which cases were you retained as an
14   accident investigator for anchoring?
15         A      I recall one in southeast Alaska,
16   in Kuskokwim [phonetic] River.  A vessel
17   anchoring there had an injury to a seaman.  I
18   don't recall all of the details of it.  And I
19   would have to look at my records to give you any
20   kind of detail.
21         Q      That was a personal injury case?
22         A      It was, yes.
23         Q      That involved some anchor
24   operation?
25         A      Yes.
```

Captain R. Russell Johnson
05/16/2018                                          51

```
 1                  Captain Russell Johnson
 2      A        Not that I can remember.
 3      Q        Any incidents -- strike that.
 4               I am reading from page three of
 5   your expert report.  This is the background,
 6   "personal background" section.  And it says:
 7               "For the past 30 years I have been
 8   responsible for investigating accidents and
 9   injuries aboard towing vessels owned by companies
10   that I have worked for."
11               Page three?
12               MR. MEEHAN:  Where?
13      Q        Page three, in the middle, second
14   sentence of the third -- fourth full paragraph.
15   It starts with, "For the past 30 years...."
16      A        I see that, yes.
17      Q        So you -- you investigated
18   accidents on tugs and tows for companies and as
19   retained as a private consultant, correct?
20      A        That's correct.
21      Q        And at least 30 years, right?
22      A        At least.
23      Q        How many accidents would you say
24   you have investigated or worked on?
25      A        That's hard to estimate.  A lot,
```

Captain R. Russell Johnson
05/16/2018                                                    52

```
 1                  Captain Russell Johnson
 2      unfortunately.
 3           Q        Hundreds?
 4           A        It could be that much.  You know, I
 5      have been doing this for a long time.  But --
 6           Q        Between 50 and 100?
 7           A        I guess, if you looked at -- in
 8      your management capacity, looked at four or five,
 9      six or eight a year over a 30-year management
10      period, it's not unreasonable to think you might
11      have investigated 100.
12           Q        And for all of -- through that
13      experience for 30 years investigating
14      approximately 100 accidents, have you ever
15      investigated an accident where a tug captain
16      dropped its anchor in a cable area and caused
17      damage to a submerged cable?
18           A        No.
19                    MR. FOLEY:  Want to take a break.
20                    MR. MEEHAN:  Sure.
21                    (A break is taken.)
22           Q        Let's go back on the record.  I'm
23      going to go over some of your facts and
24      observations; but, before we do that, I just
25      wanted to make sure here -- turn to your Johnson
```

Captain R. Russell Johnson
05/16/2018                                                    59

```
 1                  Captain Russell Johnson
 2    suspend the voyage and find a safe anchorage."
 3                  Do you see where I'm reading from,
 4    three or four sentences down?
 5         A      Of number one?
 6         Q      Yes.  It starts out, "Because of
 7    the visibility conditions."
 8         A      Three or four sentences down.
 9         Q      From the -- where we were before --
10    sorry -- it's about the lower part of paragraph
11    one, and it starts off, "Because of the
12    visibility conditions."
13         A      Okay.  I've got the sentence.
14         Q      He "made a decision to suspend the
15    voyage and find a safe anchorage."
16                  Do you see that?
17         A      Yes.
18         Q      The next sentence reads:
19                  "The decision to anchor by Captain
20    Yates was made on the spur of the moment, and he
21    decided to seek refuge in Hempstead Harbor, Long
22    Island."
23                  What do you consider the spur of
24    the moment?
25         A      Well, in a relatively short --
```

Captain R. Russell Johnson
05/16/2018                                              60

```
 1                Captain Russell Johnson

 2    short period of time as opposed to -- I am sure

 3    he did not anticipate anchoring in Hempstead

 4    Harbor six hours before that or a day before that

 5    or when he left Boston or -- I mean, the decision

 6    was made based on the conditions at the time that

 7    were reportedly zero visibility with fog.

 8                And he -- for whatever period of

 9    time that was, he made a decision:

10                "Well, I'm not going to continue,

11    you know, continue the voyage in zero visibility

12    in a -- in a busy track.  I'm going to get out of

13    here, and I'm going to anchor the barge."

14                So it was a relatively short period

15    of time is what I meant.

16         Q      And the "busy traffic lane" that

17    you think -- what are you referring to?

18         A      The traffic in Long Island Sound

19    along the general route that he was traveling on.

20         Q      Do you have -- have you reviewed

21    information that indicated that it was a "busy

22    travel lane" at the time?

23         A      You mean at the particular time?

24         Q      Yes.

25         A      I did not review what the
```

Captain R. Russell Johnson
05/16/2018                                                                61

```
 1              Captain Russell Johnson
 2   particular traffic was at the time.
 3        Q      Okay.  And Captain Yates had other
 4   choices besides seeking refuge in Hempstead
 5   Harbor, correct?
 6        A      He probably did, but he made some
 7   reasonable assessments that warranted in his mind
 8   going to Hempstead Harbor.
 9        Q      And what were those assessments?
10        A      The shortness of getting there and
11   the weather conditions at the time.  I believe he
12   wanted to anchor in more of a lee of the
13   prevailing winds at the time.
14        Q      This is based on his deposition
15   transcript?
16        A      Yes.
17        Q      Do you know why he decided on
18   Hempstead Harbor?
19        A      Other than proximity and being on
20   the east side of Long Island Sound for the wind,
21   I don't.
22        Q      Are you aware that he has anchored
23   at Hempstead Harbor before with Bouchard tugs and
24   barges?  Correct?
25        A      I seem to recall that, yes.
```

Captain R. Russell Johnson
05/16/2018                                          62

```
 1                  Captain Russell Johnson

 2         Q      Do you think that's why he went

 3   back to seek refuge at Hempstead Harbor on the

 4   morning of January 6, 2014?

 5         A      He may have been somewhat familiar

 6   with it.

 7         Q      Paragraph number two, you write in

 8   the second sentence:

 9                "The mate, Tony Hudgins, completed

10   a voyage plan as required before the vessel left

11   Boston."

12                Do you see that?

13         A      Yes, I do.

14         Q      Did you review the voyage plan for

15   this voyage?

16         A      Not for that particular voyage.  I

17   reviewed a voyage -- another voyage plan for that

18   particular route that was an example of --

19   represented an example of what was done that day.

20         Q      And how do you know that the vessel

21   was in compliance with the voyage plan if you

22   didn't review it?

23         A      Because the voyage plan is -- there

24   is not much reason for it to vary from one trip

25   to the other.  It's a plan.  It's not what
```

1                Captain Russell Johnson

2     actually happened during the voyage.  And I have

3     no reason to believe that the plan wasn't

4     similar.

5          Q      But you have never viewed the

6     actual voyage plan, right?

7          A      No, I reviewed a similar, an

8     exemplar plan.

9          Q      Do you know what happened to the

10    voyage plan for this voyage?

11         A      I do not.

12         Q      Would you agree with me that the

13    voyage plan contains relevant information if you

14    are going to investigate an incident that

15    occurred during the voyage?

16         A      I would, but I wouldn't -- I

17    wouldn't assume that it was any different than

18    the voyage plan that was done the week before or

19    the month before.

20                Again, it's just a plan.  The route

21    was the same.  The waypoints are the same.  The

22    conditions that they want to be aware of that

23    might occur, that they might have to deviate from

24    the lesson plan or the voyage plan are the same.

25                So I have no reason to think that

Captain R. Russell Johnson
05/16/2018                                    64

```
 1              Captain Russell Johnson
 2    it would be grossly different.
 3         Q       Are you aware that the tugs and
 4    barges would have to time their voyage for the
 5    tidal condition for entry into the East River at
 6    Hell Gate?
 7         A       Yes.
 8         Q       Would that be something that would
 9    be part of a voyage plan if you're in Boston on
10    January 5th and intending to enter New York
11    Harbor on January 6th?
12         A       Yes.
13         Q       But you don't know what was in the
14    voyage plan with respect to those tidal
15    conditions, correct?
16         A       I do not.
17         Q       You don't know if there was
18    something in the voyage plan that indicated
19    anchorages that might be used to wait for a tidal
20    change, correct?
21         A       On the day of the occurrence?
22         Q       Yes.
23         A       No, I didn't see it.
24         Q       Would that be reasonable --
25    something reasonable for you as a tug and tow
```

Captain R. Russell Johnson
05/16/2018                                    83

```
 1                  Captain Russell Johnson
 2        and answer.
 3        A       It's required that they know the
 4   federal regulation that applies to the particular
 5   area they are operating under.
 6        Q       Right.  But does a Responsible
 7   Carrier Program require training by the company
 8   of its crew members?  Isn't that in that section?
 9        A       No, it says not if it's a condition
10   of their license.  It's a condition of their
11   license to know that federal regulation.
12        Q       So if it's included in the license,
13   the Responsible Carrier Program doesn't require
14   you to duplicate it?
15        A       That's correct.
16        Q       But if it's not included in the
17   license, then the company does have an
18   obligation, correct?
19        A       I would read it like that.  Yeah.
20        Q       The next paragraph on the
21   observations say that you have contacted
22   operations personnel at several tow boat
23   companies?
24        A       Yes.
25        Q       Including Dunlap Towing?
```

Captain R. Russell Johnson
05/16/2018                                    84

1                    Captain Russell Johnson

2        A       Yes.

3        Q       When you say "contacted," you

4    telephoned them?

5        A       I did.

6        Q       And you spoke to someone on the

7    phone?

8        A       I did.

9        Q       Did you review their company

10   documents?

11       A       No, I only spoke to them over the

12   phone.

13       Q       So how long was the conversation

14   approximately with each of these companies?

15       A       I doubt if it was more than 15 or

16   20 minutes each.

17       Q       Each.  And it says that you

18   "inquired about their current in-house

19   procedures."

20               What are you referring to with

21   "in-house procedures"?

22       A       Their company procedures and

23   guidelines.

24       Q       Would that be the Safety Management

25   Manual for that particular company or something

Captain R. Russell Johnson
05/16/2018                                        85

1              Captain Russell Johnson

2    else?

3        A     Yeah.  No, I mean that's -- if it

4    was a requirement, it would be in their Safety

5    Management Manual yeah.

6        Q     But you didn't actually go and

7    review the Safety Management Manual for Western

8    Tow Boat, correct?

9        A     No.

10       Q     You didn't review the Safety

11   Management Manual for American Navigation?

12       A     No.

13       Q     You didn't review the Safety

14   Management Manual for Foss?

15       A     No.

16       Q     You did not review the Safety

17   Management Manual for Crowley Maritime?

18       A     Not the latest one.  I was with

19   Crowley Maritime at one time and helped rewrite

20   the Safety Management Manuel.

21       Q     Up until what time?

22       A     That was 1994.

23       Q     '94.  So that would be a

24   recollection of your review of the management

25   manual for 1994?

Captain R. Russell Johnson
05/16/2018                                                86

```
 1                   Captain Russell Johnson
 2         A       No, I talked to some -- I talked to
 3    personnel at Crowley Maritime who are actively
 4    there now.
 5         Q       You did not review the Safety
 6    Management Manual for Young Brothers?
 7         A       No.
 8         Q       Did you take notes of these
 9    conversations?
10         A       I am sure I did, but I don't have
11    them here.
12         Q       There is no specific information
13    listed here in paragraph 13 that they provided to
14    you, correct?
15         A       Written information?
16         Q       Specific, specific information that
17    they provided you as a result of those phone
18    calls?
19         A       Other than what I go on to say,
20    that -- that they don't require specific
21    oversight of their anchoring procedures or
22    provide specific instructions.  That was the
23    issue that I wanted to be specific about in my
24    discussions with them.
25         Q       And that was based just on a
```

Captain R. Russell Johnson
05/16/2018                                              92

                    Captain Russell Johnson

1

2    area or --

3         A      No.  I don't think that's a

4    reasonable assumption.

5         Q      We have confirmed that he's not

6    permitted to anchor in the cable area, correct?

7         A      That's correct.

8         Q      Now, is it your opinion that he is

9    permitted to anchor in Hempstead Harbor outside

10   of the cable area?

11               MR. MEEHAN:  Object again, because

12          he wasn't asked to give an opinion on

13          this -- regulations.  But you can answer.

14        A      Well, I mean, I would just say what

15   I said before, and that's to repeat what he said.

16   I wasn't asked to, you know, to comment on the

17   CFR regulations.

18        Q      That is what's known as a speaking

19   objection by Mr. Meehan.

20        A      Well, I said this before.  I said

21   this before, and the record will show that.

22        Q      Can you read the question back.

23               (Reporter read back pending

24   question.)

25        Q      That's the question.

Captain R. Russell Johnson
05/16/2018                                          93

                    Captain Russell Johnson

1

2        A       If that situation constituted an

3    emergency, which I believe is likely, given the

4    circumstances, I would say it would be okay for

5    him to anchor -- anchor in Hempstead Harbor.

6    Yes.

7        Q       Outside of the cable area?

8        A       Outside of the cable area.

9                So if it constituted an emergency,

10   which I believe that zero visibility in fog and

11   traffic in that particular area where the

12   loaded -- or, I mean, an oil barge, a fuel

13   barge -- could reasonably constitute an

14   emergency.

15       Q       Okay.  In the absence of an

16   emergency, is it permissible for Captain Yates or

17   for Bouchard tugs and barges to anchor in

18   Hempstead Harbor outside of the cable area?

19               MR. MEEHAN:  Objection.

20       A       Again, I am -- I am again unclear.

21   And I was not asked to interpret the CFRs.  I am

22   unclear whether it is or not.

23       Q       So you are unclear as to where you

24   can and cannot anchor in the Port of New York,

25   correct?

Captain R. Russell Johnson
05/16/2018                                          97

```
 1                    Captain Russell Johnson

 2    seek refuge, correct?

 3         A       Correct.

 4         Q       All right.  Let's go back to your

 5    first report.

 6         A       You want it back?

 7         Q       That's yours.  Actually, we may

 8    refer to it again.

 9         A       I've got too much stuff.  Do you

10    want this back?

11         Q       Actually, no, you can leave those.

12    Those are all the originals, and the court

13    reporter will take them.

14         A       These are going in as exhibits.

15    Sorry.

16         Q       Let's turn to Exhibit Number 2,

17    your supplemental report.  So you prepared this

18    supplemental expert report, Johnson Exhibit

19    Number 2, after completing your first expert

20    report, right?

21         A       Correct.

22         Q       You reviewed the report of Rick

23    DeNapoli to prepare the supplemental report?

24         A       Yes, yes.

25         Q       And you inspected the tug and barge
```

```
 1                Captain Russell Johnson

 2    on April 4th?

 3         A        Correct.

 4         Q        Why did you inspect the tug and

 5    barge?  What additional information was needed to

 6    supplement that first report?

 7         A        I just wanted to verify that the

 8    anchoring situation, the anchor setup on the

 9    barge, how it was deployed.  I wanted to look at

10    the tug.  And I wanted to see what information --

11    and that the -- and what equipment that the tug

12    had aboard for navigation and reviewing

13    documents, and just to see what their library was

14    on the boat as well.

15         Q        But in your first report, you

16    already concluded that the vessels were seaworthy

17    and there were no deficiencies, right?

18         A        Yes, in the terms of seaworthiness.

19    I wasn't on board to --

20         Q        Well, what was that first opinion

21    based on?

22         A        What was it based on?

23         Q        Yes.

24         A        Because there was nothing in the

25    reports that I read that would lead me to believe
```

Captain R. Russell Johnson
05/16/2018                                          99

                    Captain Russell Johnson

 1    that they were otherwise.

 2          Q      But then you reviewed Rick

 3    DeNapoli's report and decided you had to go back

 4    out and check -- actually check the physical

 5    condition of the equipment?

 6          A      It wasn't depending on

 7    Mr. DeNapoli's report.  That's not why -- that's

 8    not the sole reason why I came out here.

 9          Q      What is it?

10          A      The tug and barge was never

11    available at a -- at a convenient time for me to

12    come out here or convenient time for Bouchard

13    previous to that.  We spent a long time trying to

14    make those arrangements.  That was the first

15    chance that I had to actually get out and see the

16    tug and barge.

17                 We tried -- we tried for weeks and

18    weeks to try to get out here.  And it just

19    didn't -- it just didn't come together until this

20    particular period of time.

21          Q      So you were just confirming the

22    opinions that you already gave in that first

23    report by going out to inspect the tug and barge?

24          A      Yes.  And I wanted to see for

Captain R. Russell Johnson
05/16/2018                                    108

```
1              Captain Russell Johnson
2              MR. CARBIN:  They are in this
3       office?  They are here today, right?
4              MR. MEEHAN:  Yes.
5              THE WITNESS:  Yes.
6              MR. CARBIN:  Okay.  I call for
7       their production.
8              MR. FOLEY:  Okay.
9              (Names of senior operations
10      managers for Moran Towing and McAllister
11      Towing that Captain Johnson spoke with
12      requested.)
13             (There was a discussion off the
14      record.)
15             (There was a break.)
16      Q      Did you identify the people with
17 whom you spoke at Moran?
18      A      I did.
19      Q      Who was that?
20      A      Steve Kress, K-r-e-s-s, at
21 McAllister.  And Kelly Curtin, Moran Towing.
22      Q      How do you spell Curtin?
23      A      C-u-r-t-i-n, I believe.
24      Q      And did you know these -- did you
25 know Mr. Curtin from Moran Towing previously?
```

Captain R. Russell Johnson
05/16/2018                                        109

```
 1              Captain Russell Johnson
 2      A      I don't think I'd met him before.
 3      Q      Did you know Mr. Kress from
 4  McAllister?
 5      A      The same answer.
 6      Q      And how were you introduced to
 7  these people?
 8      A      By Mr. Meehan.
 9      Q      All right.  Referring to your
10  supplemental report, page three, at the bottom of
11  paragraph number two, it reads:
12              "It is not expressly prohibited" --
13  underlined -- "and anchoring in Hempstead Harbor
14  is not necessarily a violation of 33 CFR
15  110.155."
16              Do you see that?
17      A      I do.
18      Q      Again, is this referring to the
19  exception for an extreme emergency?
20      A      Yes.
21              MR. MEEHAN:  "Great emergency."
22      Q      I think you are right.
23              MR. MEEHAN:  I don't --
24      Q      No, I think you referred to an
25  "extreme emergency"; and the regulation, as
```

# EXHIBIT 4





EXHIBIT

Johnson -4
5-16-18

the Port may establish special conditions with which the vessel must comply in order for such a request to be approved.

(4) No vessel in such condition that it is likely to sink or otherwise become a menace or obstruction to navigation or anchorage of other vessels shall occupy an anchorage except in cases where unforeseen circumstances create conditions of imminent peril to personnel and then only for such period as may be authorized by the Captain of the Port.

(5) Anchors shall be placed well within the anchorage areas so that no portion of the hull or rigging will at any time extend outside of the anchorage area.

(6) The Coast Guard Captain of the Port may close the anchorage area and direct vessels to depart the anchorage during periods of adverse weather or at other times as deemed necessary in the interest of port safety and security.

(7) Any vessel anchored in these grounds must be capable of getting underway if ordered by the Captain of the Port and must be able to do so within two hours of notification by the Captain of the Port. If a vessel will not be able to get underway within two hours of notification, permission must be requested from the Captain of the Port to remain in the anchorage. No vessel shall anchor in a ''dead ship'' status (propulsion or control unavailable for normal operations) without prior approval of the Captain of the Port.

(8) Brenton Point anchorage ground is a general anchorage area reserved primarily for commercial vessels waiting to enter Narragansett Bay.

(9) Temporary floats or buoys for marking anchors or moorings in place will be allowed in this area. Fixed mooring piles or stakes will not be allowed.

(10) All coordinates referenced use datum: NAD 83.

[USCG–2009–1131, 77 FR 43517, July 25, 2012]

§ 110.150  Block Island Sound, N.Y.

(a) *The anchorage ground.* A ¾- by 2-mile rectangular area approximately 3 miles east-northeast of Gardiners Island with the following coordinates: latitude 41°06′12″ N., longitude 72°00′05″ W., latitude 41°07′40″ N., longitude

72°01′54″ W.; latitude 41°08′12″ N., longitude 72°01′10″ W.; latitude 41°06′46″ N., longitude 71°59′18″ W.

(b) *The regulations.* This anchorage ground is for use of U.S. Navy submarines. No vessel or person may approach or remain within 500 yards of a U.S. Navy submarine anchored in this anchorage ground.

[CGFR 70–114A, 36 FR 5604, Mar. 25, 1971]

§ 110.155  Port of New York.

(a) *Long Island Sound*—(1) *Anchorage No. 1.* Southwest of a line between Neptune Island and Glen Island ranging from Aunt Phebe Rock Light and tangent to the north edge of Glen Island; southwest of a line tangent to the northeast edge of Glen Island and Goose Island breakwater; southwest of a line bearing southeasterly from the southwest end of Goose Island breakwater and on range with the south gable of the Casino on the northeast end of Glen Island; west of a line ranging from the east edge of Goose Island breakwater to the west edge of the north end of Hart Island; west of Hart Island; and northwest of a line extending from Hart Island Light to Locust Point; excluding from this area, however, (i) the waters northeast of a line ranging 303° from the southwest end of Hart Island; northwest of a line ranging from the water tank at the north end of Davids Island 207°40′ to the northwest end of City Island; and south of latitude 40°52′12″; and (ii) the waters west of Hunter Island; and south of a line ranging from the most southerly end of Glen Island tangent to the most northerly end of Hunter Island.

(i) Boats shall not anchor in this area in buoyed channels.

(ii) Boats shall be so anchored as to leave at all times an open, usable channel, at least 50 feet wide, west and south of Glen Island.

NOTE: Special anchorage areas in this anchorage are described in § 110.60.

(2) *Anchorage No. 1–A.* Southwest of a line ranging from Duck Point, Echo Bay, through Bailey Rock Lighted Buoy 3 BR; northwest of a line ranging from Hicks Ledge Buoy 2H to Old Tom Head Rocks Buoy 4; and north of a line ranging from Old Tom Head Rocks

Buoy 4 to the southernmost point of Davenport Neck.

NOTE TO PARAGRAPH (a)(2): The special anchorage area in this anchorage is described in § 110.60.

(3) *Anchorage No. 1–B.* West of a line ranging from the point on the southwest side of the entrance to Horseshoe Harbor, Larchmont, to Hicks Ledge Buoy 2H; north of a line ranging from Hicks Ledge Buoy 2H to Duck Point; and in Echo Bay north and west of the channel.

NOTE TO PARAGRAPH (a)(3): The special anchorage area in this anchorage is described in § 110.60.

(4) *Anchorage No. 2.* West of a line from Locust Point tangent to the northeasterly sea wall at Throgs Neck.

NOTE: Special anchorage areas in this anchorage are described in § 110.60.

(5) *Anchorage No. 3.* Northeast of a line from the south side of Barker Point to Gangway Rock Bell Buoy 27; southeast of a line from Gangway Rock Bell Buoy 27 to Sands Point Reef Lighted Buoy 25; and southwest of a line from Sands Point Reef Lighted Buoy 25 through Sands Point Light to Sands Point.

(6) *Anchorage No. 4.* Manhassett Bay, excluding the seaplane restricted area described in § 207.35; and that portion of Long Island Sound northeast of a line ranging from Stepping Stones Light through Elm Point Buoy 2 to Elm Point; southeast of a line ranging from Stepping Stones Light to Gangway Rock Bell Buoy 27; and southwest of Anchorage No. 3.

NOTE: Special anchorage areas in this anchorage are described in § 110.60.

(7) *Anchorage No. 5.* In Little Neck Bay; and east of a line ranging from Fort Totten flagpole to Hart Island Light; and south of Anchorage No. 4.

NOTE: Special anchorage areas in this anchorage are described in § 110.60.

(b) *East River—(1) Anchorage No. 6.* On Hammond Flats north of a line bearing 260° from the head of the pier on Throgs Neck at the foot of Pennyfield Avenue to the north tower of Bronx-Whitestone Bridge at Old Ferry Point.

(2) *Anchorage No. 7.* South of a line from Whitestone Point to the outer end of Willets Point Wharf.

(3) *Anchorage No. 8.* North of a line bearing 259° between the north tower of the Bronx-Whitestone Bridge at Old Ferry Point and a point at latitude 40°47′57″, longitude 73°52′16″; thence east of a line bearing 0° to latitude 40°48′06″; thence southeast of a line parallel to the bulkhead extending northeasterly to latitude 40°48′20″; thence north of a line bearing 296° to shore.

(4) *Anchorage No. 9.* East of a line from College Point Reef Light tangent to the west side of College Point; and south of a line from College Point Reef Light to Whitestone Point.

(5) *Anchorage No. 10.* An area in Flushing Bay, beginning at a point on shore at La Guardia Airport at latitude 40°46′49″, longitude 73°52′21″; thence to latitude 40°47′20″, longitude 73°51′55″; and thence to a point on shore at College Point at latitude 40°47′38″, longitude 73°51′15″; and an area on the west side of Bowery Bay, beginning at a point on shore at latitude 40°46′58″, longitude 73°53′46″; thence to latitude 40°47′03″, longitude 73°53′39″; thence to latitude 40°47′00″, longitude 73°53′31″; thence to latitude 40°46′55″, longitude 73°53′32″; and thence to a point on shore at latitude 40°46′49″, longitude 73°53′39″.

NOTE: Special anchorage areas in this anchorage are described in § 110.60.

(6) *Anchorage No. 11.* An area in East River beginning at a point on a pierhead at latitude 40°47′55″, longitude 73°53′19.5″; thence to latitude 40°47′40″, longitude 73°51′58″; and thence to a point on shore at latitude 40°47′16″, longitude 73°52′15″.

(7) [Reserved]

(8) *Anchorage No. 14.* In Hallets Cove, east of a line from a point on shore 100 feet west of the southerly prolongation of 2d Street, Astoria, to Gibbs Point.

(c) *Hudson River—(1) Anchorage No. 16.* North of a line on a range with the north side of the north pier of the Union Dry Dock and Repair Company Shipyard, Edgewater, New Jersey; west of a line ranging 25° from a point 120 yards east of the east end of said pier to a point (500 yards from the shore and 915 yards from the Fort Lee flagpole) on a line ranging approximately 100°22′

§ 110.155                                              33 CFR Ch. I (7–1–13 Edition)

from the Fort Lee flagpole toward the square chimney on the Medical Center Building at 168th Street, Manhattan; and south of said line ranging between the Fort Lee flagpole and the square chimney on the Medical Center Building.

(i) When the use of Anchorage No. 16 is required by naval vessels, the vessels anchored therein shall move when the Captain of the Port directs them.

(2) *Anchorage No. 17.* North of a line bearing 66° from shore to a point at latitude 40°51′34″, longitude 73°56′54″; thence west of a line bearing 29° to latitude 40°52′27″, longitude 73°56′16″; thence 20° to latitude 40°54′17″, longitude 73°55′23″; thence 15° to latitude 40°56′20″, longitude 73°54′39″; thence south of a line bearing 284° to shore.

(i) When the use of Anchorage No. 17 is required by naval vessels, the vessels anchored therein shall move when the Captain of the Port directs them.

(3) *Anchorage No. 18–A.* East of lines bearing 8° from the northwest corner of the crib icebreaker north of the New York Central Railroad Company drawbridge across Spuyten Duyvil Creek (Harlem River) to a point 250 yards offshore and on line with the New York Central Railroad signal bridge at the foot of West 231st Street, extended, at Spuyten Duyvil, Bronx, New York; thence bearing 19° to the channelward face of the Mount St. Vincent Dock at the foot of West 261st Street, Riverdale, Bronx, New York.

(i) When the use of Anchorage No. 18–A is required by naval vessels the vessels anchored therein shall move when the Captain of the Port directs them.

(4) [Reserved]

(5) Anchorages No. 19 East and 19 West.

(i) Anchorage No. 19 East. All waters of the Hudson River bound by the following points: 40°49′42.6″ N, 073°57′14.7″ W; thence to 40°49′45.9″ N, 073°57′22.0″ W; thence to 40°49′52.0″ N, 073°57′22.0″ W; thence to 40°50′38.3″ N, 073°57′10.8″ W; thence to 40°50′55.4″ N, 073°56′59.7″ W; thence to 40°51′02.5″ N, 073°56′57.4″ W; thence to 40°51′00.8″ N, 073°56′49.4″ W; thence along the shoreline to the point of origin.

(ii) Anchorage No. 19 West. All waters of the Hudson River bound by the following points: 40°46′56.3″ N,

073°59′42.2″ W; thence to 40°47′36.9″ N, 073°59′11.7″ W; thence to 40°49′31.3″ N, 073°57′43.8″ W; thence to 40°49′40.2″ N, 073°57′37.6″ W; thence to 40°49′52.4″ N, 073°57′37.6″ W; thence to 40°49′57.7″ N, 073°57′47.3″ W; thence to 40°49′32.2″ N, 073°58′12.9″ W; thence to 40°49′00.7″ N, 073°58′33.1″ W; thence to 40°48′28.7″ N, 073°58′53.8″ W; thence to 40°47′38.2″ N, 073°59′31.2″ W; thence to 40°47′02.7″ N, 073°59′57.4″ W; thence to the point of origin.

(iii) The following regulations apply to 33 CFR 110.155(c)(5)(i) and (ii):

(A) No vessel may conduct lightering operations in these anchorage grounds without permission from the Captain of the Port. When lightering is authorized, the Captain of the Port New York must be notified at least four hours in advance of a vessel conducting lightering operations as required by 156.118 of this title.

(B) Any vessel conducting lightering or bunkering operations shall display by day a red flag (46 CFR 35.30–1; Pub 102; International Code of Signals signaling instructions) at its mast head or at least 10 feet above the upper deck if the vessel has no mast, and by night the flag must be illuminated by spotlight. These signals shall be in addition to day signals, lights and whistle signals as required by rules 30 (33 U.S.C 2030 and 33 CFR 83.30) and 35 (33 USC 2035 and 33 CFR 83.35) of the Inland Navigation Rules when at anchor in a general anchorage area.

(C) Within an anchorage, fishing and navigation are prohibited within 500 yards of an anchored vessel displaying a red flag.

(D) These anchorage grounds are only authorized for use by tugs and/or barges.

(E) No vessel may occupy this anchorage ground for a period of time in excess of 96 hours without prior approval of the Captain of the Port.

(F) No vessel may anchor in Anchorage No. 19 East or No. 19 West without permission from the Captain of the Port.

(G) Each vessel shall report its position within Anchorage No. 19 East or No. 19 West to the Captain of the Port immediately after anchoring.

(H) All coordinates referenced use datum: NAD 83.

468

(6) *Anchorage No. 19–A.* An area located west of Hyde Park enclosed by the coordinates starting at 41°48′35″ N 073°57′00″ W; to 41°48′35″ N 073°56′44″ W; to 41°47′32″ N 073°56′50″ W; to 41°47′32″ N 073°57′10″ W; thence back to 41°48′35″ N 073°57′00″ W (NAD 1983).

(i) No vessel may anchor in Anchorage 19–A from December 16 to the last day of February without permission from the Captain of the Port, New York.

(ii) No vessel less than 20 meters in length may anchor in Anchorage 19–A without prior approval of the Captain of the Port, New York.

(d) *Upper Bay*—(1) *Anchorage No. 20–A.* That area enclosed by coordinates starting at 40°42′02.5″ N., 74°02′25.5″ W.; to 40°42′06.5″ N., 74°02′19.5″ W.; to 40°42′05.0″ N., 74°01′58.4″ W.; to 40°41′54.5″ N., 74°01′59.2″ W.; thence to 40°41′53.0″ N., 74°02′23.0″ W.

(1) See 33 CFR 110.155 (d)(6), (d)(16), and (l).

(2) *Anchorage No. 20–B.* That area enclosed by coordinates starting at 40°41′47.0″ N., 74°02′31.5″ W.; to 40°41′42.0″ N., 74°01′02.0″ W.; to 40°41′35.3″ N., 74°02′04.2″ W.; to 40°41′29.9″ N., 74°02′07.8″ W.; to 40°41′42.6″ N., 74°02′32.7″ W.; thence back to 40°41′47.0″ N., 74°02′31.5″ W.

(1) See 33 CFR 110.155 (d)(6), (d)(16), and (l).

(3) *Anchorage No. 20–C.* That area enclosed by coordinates starting at 40°41′42.0″ N., 74°02′43.0″ W.; to 40°41′25.4″ N., 74°02′10.7″ W.; to 40°41′01.7″ N., 74°02′26.2″ W.; to 40°41′09.0″ N., 74°02′41.5″ W.; to 40°41′20.0″ N., 74°02′59.2″ W.; thence back to 40°41′42.0″ N., 74°02′43.0″ W.

(1) See 33 CFR 110.155 (d)(6), (d)(16), and (l).

(4) *Anchorage No. 20–D.* That area enclosed by coordinates starting at 40°41′09.5″ N., 74°02′49.5″ W.; to 40°40′59.2″ N., 74°02′27.9″ W.; to 40°40′44.5″ N., 74°02′37.5″ W.; to 40°40′42.7″ N., 74°03′07.6″ W.; thence back to 40°41′09.5″ N., 74°02′49.5″ W.

(1) See 33 CFR 110.155 (d)(6), (d)(16), and (l).

(5) *Anchorage No. 20–E.* That area enclosed by coordinates starting at 40°40′38.2″ N., 74°02′59.6″ W.; to 40°40′39.4″ N., 74°02′40.9″ W.; to 40°40′09.2″ N., 74°03′00.7″ W.; to 40°40′24.4″ N., 74°03′24.6″

W.; thence back to 40°40′38.2″ N., 74°02′59.6″ W.

(1) See 33 CFR 110.155 (d)(6), (d)(16), and (l).

(6) No vessel may occupy this anchorage for a period of time in excess of 72 hours without the prior approval of the Captain of the Port.

(7) *Anchorage No. 20–F.* All waters bound by the following points: 40°40′12.2″ N, 074°03′39.9″ W; thence to 40°39′53.9″ N, 074°03′09.6″ W; thence to 40°39′38.9″ N, 074°03′19.5″ W; thence to 40°39′53.5″ N, 074°03′53.7″ W; to the point of origin (NAD 83).

(1) See 33 CFR 110.155 (d)(9), (d)(16), and (l).

(ii) [Reserved]

(8) *Anchorage No. 20–G.* That area enclosed by coordinates starting at 40°39′30.1″ N., 74°04′08.0″ W.; to 40°39′32.0″ N., 74°03′53.5″ W.; to 40°39′27.8″ N., 74°03′42.5″ W.; to 40°39′13.0″ N., 74°03′51.0″ W.; to 40°39′09.5″ N., 74°04′23.1″ W.; thence back to 40°39′30.1″ N., 74°04′08.0″ W.

(1) See 33 CFR 110.155 (d)(9), (d)(16), and (l).

(9) This anchorage is designated a naval anchorage. The Captain of the Port may permit commercial vessels to anchor temporarily in this anchorage, ordinarily not more than 24 hours, when the anchorage will not be needed for naval vessels. Upon notification of an anticipated naval arrival, any commercial vessel so anchored must relocate at its own expense.

(10) *Anchorage No. 21–A.* That area enclosed by coordinates starting at 40°40′22.5″ N., 74°01′35.2″ W.; to 40°40′20.5″ N., 74°01′27.7″ W.; to 40°39′48.9″ N., 74°01′23.4″ W.; to 40°38′54.7″ N., 74°02′18.9″ W.; to 40°39′03.0″ N., 74°02′26.3″ W.; thence back to 40°40′22.5″ N., 74°01′35.2″ W.

(1) See 33 CFR 110.155 (d)(16) and (l).

(ii) No vessel may occupy this anchorage for a period of time in excess of 96 hours without prior approval of the Captain of the Port.

(11) *Anchorage No. 21–B.* That area enclosed by coordinates starting at 40°40′23.8″ N., 74°02′10.9″ W.; to 40°40′26.2″ N., 74°01′49.5″ W.; to 40°40′22.5″ N., 74°01′35.2″ W.; to 40°39′03.0″ N., 74°02′26.3″ W.; to 40°38′54.7″ N., 74°02′18.9″ W.; to 40°38′43.7″ N., 74°02′30.3″ W.; to 40°39′19.3″ N., 74°03′03.3″ W.; to 40°39′22.3″ N.,

74°03′02.4″ W.; to 40°40′18.6″ N., 74°02′25.5″ W.; thence back to 40°40′23.8″ N., 74°02′10.9″ W.

(i) See 33 CFR 110.155 (d)(16) and (l).

(ii) No vessel with a draft of 10 feet (3.048 meters) or less may occupy this anchorage without the prior approval of the Captain of the Port.

(iii) No vessel may occupy this anchorage for a period of time in excess of 96 hours without prior approval of the Captain of the Port.

(12) *Anchorage No. 21–C.* That area enclosed by coordinates starting at 40°39′19.3″ N., 74°03′03.3″ W.; to 40°38′43.7″ N., 74°02′30.3″ W.; to 40°38′41.6″ N., 74°02′32.5″ W.; to 40°38′03.0″ N., 74°02′48.7″ W.; to 40°38′03.0″ N., 74°03′03.5″ W.; to 40°38′38.4″ N., 74°03′15.5″ W.; thence back to 40°39′19.3″ N., 74°03′03.3″ W.

(i) See 33 CFR 110.155 (d)(16) and (l).

(ii) No vessel with a draft of 33 feet (10.0584 meters) or less may occupy this anchorage without the prior approval of the Captain of the Port.

(iii) No vessel may occupy this anchorage for a period of time in excess of 96 hours without prior approval of the Captain of the Port.

(13) Anchorage No. 23–A. That area enclosed by coordinates starting at 40°38′36.5″ N., 74°04′13.5″ W.; to 40°38′37.0″ N., 74°03′49.0″ W.; to 40°38′23.4″ N., 74°03′37.2″ W.; to 40°37′49.5″ N., 74°03′25.7″ W.; to 40°37′49.8″ N., 74°03′50.1″ W.; to 40°37′50.0″ N., 74°03′50.2″ W.; to 40°37′53.0″ N., 74°04′07.0″ W.; thence back to 40°38′36.5″ N., 74°04′13.5 W.

(i) See 33 CFR 110.155 (d)(16) and (l).

(ii) No vessel may occupy this anchorage for a period of time in excess of 48 hours without the prior approval of the Captain of the Port.

(iii) No vessel with a length overall in excess of 670 feet (204.216 meters) may occupy this anchorage without the prior approval of the Captain of the Port.

(iv) No vessel with a draft of 40 feet (12.192 meters) or more may occupy this anchorage without the prior approval of the Captain of the Port unless it anchors within 5 hours after ebb current begins at the Narrows.

(v) See 33 CFR 334.85 for information on anchoring near the U.S. Navy restricted area adjacent to this anchorage.

(14) Anchorage No. 23–B. That area enclosed by coordinates starting at 40°37′49.8″ N., 74°03′50.1″ W.; to 40°37′49.5″ N., 74°03′25.7″ W.; to 40°37′27.0″ N., 74°03′18.1″ W.; to 40°37′23.0″ N., 74°03′59.0″ W.; to 40°37′30.0″ N., 74°04′04.0″ W.; to 40°37′37.5″ N., 74°03′46.0″ W.; thence back to 40°37′49.8″ N., 74°03′50.1″ W.

(i) See 33 CFR 110.155(d)(13) (ii) and (iv), (d)(16), and (l).

(ii) No vessel with a length overall of 670 feet (204.216 meters) or less may occupy this anchorage without the prior approval of the Captain of the Port.

(iii) See 33 CFR 334.85 for information on anchoring near the U.S. Navy restricted area adjacent to this anchorage.

(15) *Anchorage No. 24.* That area enclosed by coordinates starting at 40°37′23.0″ N., 74°03′59.0″ W.; to 40°37′27.0″ N., 74°03′18.1″ W.; to 40°36′40.1″ N., 74°03′02.2″ W.; to 40°36′25.5″ N., 74°02′56.4″ W.; to 40°36′21.0″ N., 74°03′11.0″ W.; to 40°36′25.0″ N., 74°03′17.5″ W.; thence back to 40°37′23.0″ N., 74°03′59.0″ W.

(i) See 33 CFR 110.155(d)(13) (ii) and (iv), (d)(16), and (l).

(ii) No vessel with a length overall of less than 800 feet (243.84 meters), or with a draft of less than 40 feet (12.192 meters) may occupy this anchorage without the prior approval of the Captain of the Port.

(16) Any vessel anchored in or intending to anchor in Federal Anchorage 20–A through 20–G, 21–A through 21–C, 23–A and 23–B, 24 or 25 must comply with the following requirements:

(i) No vessel may anchor unless it notifies the Captain of the Port when it anchors, of the vessel's name, length, draft, and its position in the anchorage.

(ii) Each vessel anchored must notify the Captain of the Port when it weighs anchor.

(iii) No vessel may conduct lightering operations unless it notifies the Captain of the Port before it begins lightering operations.

(iv) Each vessel lightering must notify the Captain of the Port at the termination of lightering.

(v) No vessel may anchor unless it maintains a bridge watch, guards and answers Channel 16 FM, and maintains an accurate position plot.

(vi) If any vessel is so close to another that a collision is probable, each vessel must communicate with the other vessel and the Captain of the Port on Channel 16 FM and shall act to eliminate the close proximity situation.

(vii) No vessel may anchor unless it maintains the capability to get underway within 30 minutes except with prior approval of the Captain of the Port.

(viii) No vessel may anchor in a "dead ship" status (propulsion or control unavailable for normal operations) without the prior approval of the Captain of the Port.

(ix) Each vessel in a "dead ship" status must engage an adequate number of tugs alongside during tide changes. A tug alongside may assume the Channel 16 FM radio guard for the vessel after it notifies the Captain of the Port.

(x) No vessel may lighter in a "dead ship" status without prior approval from the Captain of the Port.

(e) *Lower Bay*—(1) *Anchorage No. 25.* That area enclosed by coordinates starting at 40°35′58.2″ N., 74°02′18.4″ W.; to 40°36′12.0″ N., 74°01′29.0″ W.; to 40°36′03.0″ N., 74°00′52.5″ W., to 40°34′57.5″ N., 74°00′25.0″ W.; to 40°34′40.0″ N., 74°01′03.0″ W.; to 40°34′53.0″ N., 74°01′56.1″ W.; to 40°35′23.9″ N., 74°02′04.8″ W.; thence back to 40°35′58.2″ N., 74°02′18.4″ W.

(i) See 33 CFR 110.155(d)(16) and (l).

(ii) When the use of this anchorage is required by naval vessels, any commercial vessels anchored therein must move when directed by the Captain of the Port.

(iii) No vessel may occupy this anchorage for a period of time in excess of 96 hours without prior approval of the Captain of the Port.

(f) *Lower Bay*—(1) *Anchorage No. 26.* In Sandy Hook Bay south of a line extending from Point Comfort to Sandy Hook Point Light.

NOTE: Anchorages Nos. 49–F and 49–G in this area are reserved for vessels carrying explosives (see paragraphs (m)(2) and (3) of this section) and are excluded from use as general anchorages.

(i) Pleasure or commercial craft may not navigate or moor within 750 yards of the Naval Ammunition Depot Pier at Leonardo, New Jersey, nor anchor in the approach channel or the turning basin adjacent thereto.

(ii) When immediate action is required and representatives of the Coast Guard are not present in sufficient force to exercise effective control of shipping, the Commanding Officer of the Naval Ammunition Depot at Earle, New Jersey, may control the anchorage or movement of any vessel, foreign or domestic, to the extent he deems necessary to insure the safety and security of his command.

(2) *Anchorage No. 27*—(1) *Atlantic Ocean.* Beginning at Sandy Hook Light 15 to latitude 40°28′52″, longitude 74°00′03″; thence to latitude 40°28′41″, longitude 73°58′54″; thence to latitude 40°25′58″, longitude 73°55′00″; thence 180° to latitude 40°23′46″, thence 270° toward Highland Light and Sandy Hook shore; thence following the easterly shoreline of Sandy Hook to the point of beginning.

(ii) *Romer Shoal.* All waters bound by the following points: 40°28′27.21″N, 073°56′45.84″W; thence to 40°29′47.70″N, 073°56′46.23″W; thence to 40°31′25.38″N, 074°00′53.50″W; thence to 40°32′11.38″N, 074°01′39.50″W; thence to 40°32′12.38″N, 074°02′05.50″W; thence to 40°31′27.38″N, 074°02′05.50″W; thence to 40°30′13.38″N, 074°00′05.50″W; thence to the point of origin (NAD 83).

(iii) *Flynns Knoll.* Beginning at Sandy Hook Channel Lighted Bell Buoy 18; thence along the north side of Sandy Hook Channel to Sandy Hook Channel Lighted Buoy; thence along the southwest side of Swash Channel to Junction Buoy; thence along the east side of Chapel Hill Channel to Chapel Hill Channel Buoy 2; and thence to the point of beginning.

(3) *Anchorage No. 28.* West of lines bearing 154°30′ from Fort Wadsworth Light to Craven Shoal Lighted Bell Buoy 19A, thence in succession to the buoys marking the east side of West Bank and the buoys on the west side of Chapel Hill Channel to Southwest Spit Junction Lighted Gong Buoy, thence 182° to a line extending from Sandy Hook Point Light to Point Comfort; north of the latter line and the New Jersey shore; and east of a line bearing 353° from the head of the Keansburg Steamboat Pier at Point Comfort,

through Great Kills Flat Buoy 4, to the Staten Island shore; excluding from this area, however, (i) the waters west of a line ranging from the stack on Hoffman Island 344° through the northeast corner of the T-shaped pier at South Beach; northwest of a line ranging from Great Kills Light 39° and tangent to the offshore face of the T-shaped pier at Midland Beach; and northeast of a line ranging from the stack on Swinburne Island 301° to the shore end of the north jetty at New Creek; and (ii) the waters west of a line ranging from Conover Light at Leonardo, New Jersey, 340° through Old Orchard Shoal Light; northwest of a line bearing 230° from the stack on Hoffman Island; and northeast of a line ranging from Great Kills Light 332° through Marine Park Light at Crooks Point.

NOTE TO PARAGRAPH (f)(3): The special anchorage area in this anchorage is described in § 110.60.

(g) [Reserved]

(h) *Newark Bay.* (1) *Anchorage No. 34.* All waters bound by the following points: 40°38'51.5" N, 074°10'35.6" W; thence to 40°39'20.2" N, 074°09'50.8" W; thence to 40°39'41.4" N, 074°09'30.2" W; thence to 40°39'29.6" N, 074°08'58.0" W; thence to 40°39'21.7" N, 074°08'50.8" W; thence to 40°39'08.0" N, 074°08'58.9" W; thence to 40°38'49.9" N, 074°09'20.0" W; thence to 40°38'53.5" N, 074°09'37.1" W; thence to 40°38'52.0" N, 074°09'41.6" W; thence to the point of origin (NAD 83).

(2) [Reserved]

(3) *Anchorage No. 36.* All waters bound by the following points: 40°41'13.1" N, 074°08'05.1" W; thence to 40°41'12.7" N, 074°08'09.9" W; thence to 40°40'51.0" N, 074°08'29.7" W; thence to 40°40'44.7" N, 074°08'29.8" W; thence to 40°40'34.0" N, 074°08'12.0" W; thence to 40°40'36.6" N, 074°08'04.8" W; thence to 40°40'54.5" N, 074°07'56.5" W; thence to 40°41'03.3" N, 074°07'56.5" W; thence to the point of origin (NAD 83).

(4) *Anchorage No. 37.* North of the Central Railroad of New Jersey bridge; east of a line ranging from a point 200 yards east of the east pier of the east lift span of the bridge to a point 200 yards east of the east end of the lift span of the Pennsylvania-Lehigh Valley Railroad bridge; and south of the latter bridge.

NOTE TO PARAGRAPH (h)(4): The special anchorage area in this anchorage is described in § 110.60.

(5) *Anchorage No. 38.* North of the Pennsylvania-Lehigh Valley Railroad bridge; east of lines ranging through a point 200 yards east of the east end of the lift span of the said bridge and the red channel buoys marking the dredged channel in Newark Bay and Hackensack River; and south of the Central Railroad Company of New Jersey bridge.

(6) *Anchorage No. 39.* Between the entrance channels of the Hackensack and Passaic Rivers, northwest of lines from the abutment of the Central Railroad of New Jersey bridge on the west side of the Hackensack River to Hackensack River Light 1, and thence to Newark Bay Light 5, and east of a line from said light ranging toward the southeast corner of the Texas Company wharf, and of a line ranging from the southeast corner of Gross Wharf to the abutment and end of fill of the Central Railroad of New Jersey bridge on the east side of the Passaic River.

(i) *Arthur Kill*—(1) *Anchorage No. 41.* The passage between Pralls Island and Staten Island included between a line running 29° from the extreme northwest point of Pralls Island to a point on Staten Island and a line from the southern point of Pralls Island to the north side of the mouth of Neck Creek at Travis, Staten Island.

(2) *Anchorage No. 42.* East of lines ranging from the head of the Tottenville Shipyard Company pier at Tottenville, Staten Island, to the first pier of the Outerbridge Crossing west from the Staten Island shore, thence to Arthur Kill Light 10, thence to Arthur Kill Light 14, and thence to Arthur Kill Lighted Buoy 16; and south of a line from thence to Smoking Point.

(j) *Raritan Bay*—(1) *Anchorage No. 44.* An area in Raritan Bay located at the junction of Arthur Kill and Raritan River, beginning at a point at latitude 40°30'07", longitude 74°15'30"; thence to latitude 40°30'01", longitude 74°15'30"; thence to latitude 40°29'27", longitude 74°15'06"; thence to latitude 40°29'24", longitude 74°15'01"; thence to latitude 40°29'15", longitude 74°14'55"; thence to latitude 40°29'14", longitude 74°15'25"; thence to latitude 40°29'48", longitude

74°15′48″; and thence to the point of beginning.

(i) The anchorage is restricted to deep-draft vessels except that barges may moor in that portion of the anchorage southerly of latitude 40°29′22″.

(ii) No vessel shall occupy the deep-draft portion of the anchorage for a longer period than 48 hours without a permit from the Captain of the Port.

(2) *Anchorage No. 45.* West of the Raritan Bay Channel leading into Arthur Kill; north of the Raritan River Channel leading into Raritan River; and east of the Cutoff Channel between Raritan River and Arthur Kill, except that part of the said area occupied by Anchorage No. 44.

(3) [Reserved]

(4) *Anchorage No. 46.* West of the west limit of Anchorage No. 28, as defined by a line bearing 353° from the head of the Keansburg Steamboat Pier at Point Comfort, through Great Kills Flat Buoy 4 to the Staten Island shore; north of Raritan Bay Channel as defined by the buoys and lights marking the north side of the channel, including Princess Bay; northeast of Raritan Bay Channel leading into Arthur Kill; and south of a line bearing 243° from the gable of a house at Ward Point, Staten Island.

(5) *Anchorage No. 47.* South of the Raritan River Channel from opposite the Sun Oil Company pier at South Amboy to Raritan River Buoy 3; thence south of a line in the direction of Boundary Daybeacon to latitude 40°28′48.5″, longitude 74°14′31.6″; thence south of lines through Raritan Bay Light 7B, Raritan Bay Light 3A, and the buoys marking the south side of Raritan Bay Channel Off Seguine Point to the west limit of Anchorage No. 28 as defined by a line bearing 353° from the head of the Keansburg Steamboat Pier through Great Kills Flat Buoy 4 to the Staten Island shore; and west of the latter line.

(i) Vessels shall not anchor in the channel to Keyport Harbor west of lines ranging from Keyport Channel Buoy 1 to Keyport Channel Buoy 9, thence through Keyport Channel Buoys 11 and 13 to the northeast corner of the easterly steamboat wharf; and east of a line extending from a point 400 yards west of Keyport Channel Buoy 1 tangent to the west shore at the mouth of Matawan Creek.

(k) [Reserved]

(l) *General regulations.* (1) No vessel in excess of 800 feet (243.84 meters) in length overall or 40 feet (12.192 meters) in draft may anchor unless it notifies the Captain of the Port at least 48 hours prior to entering Ambrose Channel.

(2) Except in cases of great emergency, no vessel shall be anchored in the navigable waters of the Port of New York outside of the anchorage areas established in this section, nor cast anchor within a cable or pipe line area shown on a Government chart, nor be moored, anchored, or tied up to any pier, wharf, or vessel in such manner as to obstruct or endanger the passage of any vessel in transit by, or to or from, adjacent wharves, piers, or slips.

(3) No vessel shall occupy for a longer period than 30 days, unless a permit is obtained from the Captain of the Port for that purpose, any anchorage for which the time of occupancy is not otherwise prescribed in this section. No vessel in a condition such that it is likely to sink or otherwise become a menace or obstruction to navigation or anchorage of other vessels shall occupy an anchorage except in an emergency, and then only for such period as may be permitted by the Captain of the Port.

(4) Whenever, in the opinion of the Captain of the Port, such action may be necessary, that officer may require any or all vessels in any designated anchorage area to moor with two or more anchors.

(5) Every vessel whose crew may be reduced to such number that it will not have sufficient men on board to weigh anchor at any time shall be anchored with two anchors, with mooring swivel put on before the crew shall be reduced or released, unless the Captain of the Port shall waive the requirement of a mooring swivel.

(6) Anchors of all vessels must be placed well within the anchorage areas, so that no portion of the hull or rigging shall at any time extend outside the boundaries of the anchorage area.

(7) Any vessel anchoring under circumstances of great emergency outside of the anchorage areas must be placed

473

near the edge of the channel and in such position as not to interfere with the free navigation of the channel nor obstruct the approach to any pier nor impede the movement of any boat, and shall move away immediately after the emergency ceases, or upon notification by the Captain of the Port.

(8) The Captain of the Port may grant a revocable permit for the habitual maintenance and use of a given mooring space in an anchorage area. Application information for a mooring permit is available from:

Coast Guard Sector New York, Waterways Management Division, 212 Coast Guard Drive, Staten Island, NY 10305.

(i) A mooring permit is issued to an individual, for his exclusive use, of a specific mooring, of a specific type, at a specific location, for a specific vessel.

(ii) Mooring permits shall expire on April 30 of the year after issuance.

(iii) Mooring permits are not transferable.

(iv) Moorings are shown on the large scale chart which may be seen at the office of the Captain of the Port—New York.

(v) Mooring anchor, chain, and pendant (if applicable) requirements are shown in Table 110.155(l)(7). These requirements may be waived or modified by the Captain of the Port upon written request from the applicant for such waiver or modification.

(vi) The mooring buoy shall be white in color with the Captain of the Port mooring permit number, in black letters, clearly visible at all times. The buoy is to extend not less than 1 foot above the surface of the water at all times, exclusive of flagstaffs, rings, quick pickup devices, etc.

(vii) All required equipment shall be provided by, installed by, and remain the property of the permit holder.

(viii) Mooring equipment should be raised at least every 2 years, inspected

for deterioration and replaced if necessary.

(ix) Each person holding a mooring permit shall make what the Captain of the Port—New York considers reasonable use of the mooring. Nonuse of a mooring up to 30 days during the boating season is deemed reasonable.

(x) Moorings for which permits have expired without renewal or have been revoked by the Captain of the Port—New York shall be removed by the owner within 10 days of such expiration or revocation.

(xi) Granting of a Captain of the Port—New York mooring permit does not give a right of access across private property. Arrangements for access shall be made by the permit holder.

(xii) Each person to whom a Captain of the Port—New York mooring permit is issued agrees to hold harmless the United States, its officers, agents, and employees, for any death, personal injury, or damage which may result from the use of the permit or the rights granted under the permit.

(xiii) No vessel shall continuously occupy a mooring when a vessel in regular traffic requires the berth or when navigation would be menaced or inconvenienced thereby.

(xiv) No vessel shall moor in any anchorage in such a manner as to interfere with the use of a duly authorized mooring buoy. Nor shall any vessel moored to a buoy authorized by a Captain of the Port—New York permit be moored such that any portion of that vessel comes within 50 feet of a marked or dredged channel.

(xv) No vessel shall be navigated within the limits of an anchorage at speed exceeding 6 knots when in the vicinity of a moored vessel.

(xvi) In an emergency the Captain of the Port may shift the position of any unattended vessel moored in or near any anchorage.

TABLE 110.155(l)(7)

| Vessel length, in feet | Anchor weight, in pounds | Anchor type | Anchor scope | Chain size in inches | Pendant length in feet | Pendant safe working load minimum |
|---|---|---|---|---|---|---|
| 15 or less | 100 | Mushroom or navy. | 3x MHW | 5/16 | 4 | 4x anchor weight. |
| Greater than 15 but not greater than 21. | 150 | Mushroom or navy. | 3x MHW | 3/8 | 8 | Do. |

TABLE 110.155(I)(7)—Continued

| Vessel length, in feet | Anchor weight, in pounds | Anchor type | Anchor scope | Chain size in inches | Pendant length in feet | Pendant safe working load minimum |
|---|---|---|---|---|---|---|
| Greater than 21 but not greater than 26. | 200 | Mushroom or navy. | 3x MHW | 5/8 | 10 | Do. |
| Greater than 26 | 10 per foot of vessel length. | Mushroom or navy. | 3x MHW | 1/2 for anchor of 400 # or less, 5/8 if greater than 400 #. | 10 | Do. |

(9) Barge dispensing stations and stake boats may be anchored in such places as the Captain of the Port may designate.

(10) Upon approval of the District Engineer, Corps of Engineers, the Captain of the Port may permit wrecking plant or other vessels legally engaged in recovering sunken property, or in laying or repairing pipe lines or cables legally established, or plant engaged in dredging operations, to anchor within channels of the Port of New York. Permit issued by the Captain of the Port is not necessary for plant engaged upon works of river and harbor improvement under the supervision of the District Engineer, but the District Engineer will notify the Captain of the Port in advance of all such proposed work.

(11) Whenever the maritime or commercial interests of the United States so require, the Captain of the Port is hereby empowered to shift the position of any vessel anchored within the anchorage areas, of any vessel anchored outside the anchorage areas, of any vessel which is so moored or anchored as to impede or obstruct vessel movements in any channel or obstruct or interfere with range lights and of any vessel which, lying at the exterior end of a pier or alongside an open bulkhead, obstructs or endangers the passage of vessels in transit by, or to or from, adjacent wharf property or impedes the movements of vessels entering or leaving adjacent slips.

(12) A vessel upon being notified to move into the anchorage limits or to shift its position on anchorage grounds, shall get under way at once or signal for a tug, and shall change position as directed, with reasonable promptness.

(13) Nothing in this section shall be construed as relieving any vessel or the owner or person in charge of any vessel from the penalties of law for obstructing navigation or for obstructing or interfering with range lights, or for not complying with the navigation laws in regard to lights, fog signals, or for otherwise violating law.

(14) Any vessel prohibited by these rules from anchoring in a specific anchorage because of the vessel's length or draft may anchor in the anchorage with permission from the Captain of the Port.

(m) *Anchorages for vessels carrying explosives.* (1) [Reserved]

(2) *Anchorage No. 49–F (emergency naval anchorage).* That portion of Sandy Hook Bay bounded by a line bearing 170°, 3,800 yards, from a point bearing 281°30', 2,050 yards from Sandy Hook Light; thence 260°, 500 yards; thence 350°, 3,800 yards; thence 080°, 500 yards, to the point of beginning.

(i) This anchorage is to be used for the anchorage of naval vessels during emergencies only.

(ii) No pleasure or commercial craft shall navigate or moor within this area at any time when naval vessels which are moored in the area display a red flag by day or a red light by night.

(3) *Anchorage No. 49–G (naval anchorage).* That portion of Sandy Hook Bay bounded by a line bearing 208°, 1,350 yards, from a point bearing 292°30', 3,600 yards, from Sandy Hook Light; thence 298°, 620 yards; thence 002°, 1,250 yards; thence 107°, 1,150 yards, to the point of beginning.

(i) No pleasure or commercial craft shall navigate or moor within this area at any time when vessels which are moored in the area display a red flag by day or a red light by night.

(n) *Regulations for explosive anchorages.* (1) Anchorages Nos. 49–F and 49–G

are reserved for vessels carrying explosives. All vessels carrying explosives shall be within these areas when anchored, except as provided in paragraph (n)(6) of this section.

(2) A written permit shall be obtained from the Captain of the Port before vessels carrying explosives, or on which explosives are to be loaded, may proceed to the anchorages provided for them; and no vessel shall occupy a berth in such anchorage except by authority of such permit, which permit may be revoked at any time.

(3) Vessels used in connection with loading or unloading explosives on vessels in anchorage areas, including tugs and stevedore boats, shall carry a written permit from the Captain of the Port. The Captain of the Port may, in his discretion, require every person having business on board vessels which are being loaded with explosives, other than members of the crew, to have a pass from the Captain of the Port in such form as he shall prescribe. Such permit or pass shall be shown whenever required by him or by his authorized agents.

(4) Whenever any vessel not fitted with mechanical power anchors in the explosives anchorages while carrying explosives, the Captain of the Port may require the attendance of a tug upon such vessel when in his judgment such action is necessary.

(5) Vessels carrying explosives shall comply with the general regulations in paragraph (l) of this section when applicable.

(6) The District Engineer, Corps of Engineers, may authorize, in writing, a vessel carrying explosives for use on river and harbor works or on other work under Federal permit issued by the District Engineer to anchor in or near the vicinity of such work without a permit from the Captain of the Port. The District Engineer will prescribe the quantities of such explosives allowed on such vessel and the conditions under which they are to be stored and handled, and will furnish the Captain of the Port with a copy of such safety instructions together with a copy of his written authorization.

(7) Every vessel loading, unloading, transporting, or containing explosives shall display by day a red flag at least 16 square feet in area at its masthead, or at least 10 feet above the upper deck if the vessel has no mast, and shall display by night a red light in the same position specified for the flag.

(8) When local regulations of any place require previous local authority for the transfer of explosives or fireworks between vessels or between a vessel and a wharf or other place ashore, the Captain of the Port will permit the removal from the anchorage of such vessel containing explosives to any place covered by such local regulations only when he is satisfied that the required local authority has been granted.

NOTE: The anchorage in this section are regulated under Title I, Ports and Waterways Safety Act of 1972 as stated in §110.1a(a) of this part. The penalties for violating regulations under this Act are stated in §110.1a(b) of this part.

[CGFR 67–46, 32 FR 17728, Dec. 12, 1967]

EDITORIAL NOTE: For FEDERAL REGISTER citations affecting §110.155, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at *www.fdsys.gov.*

§ 110.156   Randall Bay, Freeport, Long Island, N.Y.

(a) *The anchorage grounds.* Southward of a line 312 feet south of and parallel to the south side of Casino Street; eastward of a line 215 feet east of and parallel to the east side of West Side Avenue, said line extending southerly to a point 233 feet north of the prolonged north side of Clinton Street; northeastward of a line from the last-mentioned point to a point 243 feet southerly of the prolonged south side of Clinton Street and 210 feet east of the east side of Prospect Street; eastward of a line 210 feet east of and parallel to the east side of Prospect Street; northward of a line 25 feet north of and parallel to the prolonged north side of Clinton Street; westward of a line 210 feet west of and parallel to the west side of South Long Beach Avenue, said line extending northerly to a point 222 feet south of the prolonged south side of Queens Street; southwestward of a line from the last-mentioned point to a point 74 feet northerly of the prolonged north side of Queens Street and 120 feet west of the west side of Roosevelt Avenue;

476